FILED
2023 Jul-31  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TRAVIS SENTEL PICKENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:21-cv-00610-ACA-HNJ |
| | ) | |
| DEBORAH TONEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Travis Sentel Pickens ("Pickens") filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights while housed at Limestone Correctional Facility. (Doc. 1).[1] Pickens named Warden Deborah Toney, Warden William Streeter,[2] Captain James Smith,[3] Warden Errol Pickens,[4] Lieutenant Michael

---

[1] Citations herein to "Doc(s). __" correspond to the document number of the pleadings and other materials in the court file, as compiled by the Clerk and reflected on the docket sheet. Unless otherwise noted, pinpoint citations reflect the page of the electronically filed document, which may not correspond to the pagination on the original "hard copy."

[2] Pickens named "Warden Streeter" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Warden William Streeter filed a response. (Doc. 31 at 1 n.1). Pickens did not dispute he intended to name Warden William Streeter as a defendant.

[3] Pickens named "Captain Smith" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Captain James Smith filed a response. (Doc. 31 at 1 n.2). Pickens did not dispute he intended to name Correctional Captain James Smith as a defendant.

[4] Pickens named "Captain Pickens" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, then-Correctional Captain Errol Pickens filed a response. (Doc. 31 at 1 n.3). Pickens did not dispute he intended to name then-Correctional Captain Errol Pickens as a defendant.

Coady,[5] Captain Shannon Caldwell,[6] Lieutenant Hanswer Whitfield,[7] Lieutenant Steven

Howell,[8] Sergeant Joshua Beaty,[9] Sergeant Luther Smith,[10] (collectively "the

Supervisory Defendants") as well as Correctional Officer Alex Andrews,[11] Correctional

Officer Caleb Lieber,[12] Correctional Officer Phillip McMahan,[13] Correctional Officer

---

[5] Pickens named "Lt Cody" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Lieutenant Michael Coady filed a response. (Doc. 31 at 1 n.4). Pickens did not dispute he intended to name Correctional Lieutenant Michael Coady as a defendant.

[6] Pickens named "Lt Coldwell" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, then-Correctional Lieutenant Shannon Caldwell filed a response. (Doc. 31 at 1 n.5). Pickens did not dispute he intended to name then-Correctional Lieutenant Shannon Caldwell as a defendant.

[7] Pickens named "Lt Whitfield" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Lieutenant Hanswer Whitfield filed a response. (Doc. 31 at 2 n.6). Pickens did not dispute he intended to name Correctional Lieutenant Hanswer Whitfield as a defendant.

[8] Pickens named "Stg Howell" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, then-Correctional Sergeant Steven Howell filed a response. (Doc. 31 at 2 n.7). Pickens did not dispute he intended to name then-Correctional Sergeant Steven Howell as a defendant.

[9] Pickens named "Stg Beate" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Sergeant Joshua Beaty filed a response. (Doc. 31 at 2 n.8). Pickens did not dispute he intended to name Correctional Sergeant Joshua Beaty as a defendant.

[10] Pickens named "Stg Smith" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Sergeant Luther Smith filed a response. (Doc. 31 at 2 n.9). Pickens did not dispute he intended to name Correctional Sergeant Luther Smith as a defendant.

[11] Pickens named "CO Andrews" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Officer Alex Andrews filed a response. (Doc. 33 at 1 ¶ 2). Pickens did not dispute he intended to name Correctional Officer Alex Andrews as a defendant.

[12] Pickens named "CO Lieber" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Officer Caleb Lieber filed a response. (Doc. 33 at 1-2 ¶ 3). Pickens did not dispute he intended to name Correctional Officer Caleb Lieber as a defendant.

[13] Pickens named "CO McMahan" as a defendant. (Doc. 1 at 1). Based upon the details provided in Pickens's Complaint, Correctional Officer Phillip McMahan filed a response. (Doc. 33 at

Nicholas Neve,[14] Correctional Officer David Roggensack, [15] and Correctional Officer Chris Weller[16] (collectively "the Correctional Officer Defendants") as defendants. (Doc. 1 at 1).  Pickens seeks monetary relief, demotion of the Supervisory Defendants,[17] and termination of the Correctional Officer Defendants.[18]  (Doc. 1 at 4).  Consistent with its usual practice, the court referred the complaint to the undersigned Magistrate Judge for a preliminary report and recommendation pursuant to 28 U.S.C. § 636(b)(1). *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

For the following reasons discussed herein, the undersigned Magistrate Judge

---

2 ¶ 4).   Pickens did not dispute he intended to name Correctional Officer Phillip McMahan as a defendant.

[14] Pickens named "CO Neve" as a defendant.  (Doc. 1 at 1).  Based upon the details provided in Pickens's Complaint, Correctional Officer Nicholas Neve filed a response.  (Doc. 33 at 2 ¶ 5).  Pickens did not dispute he intended to name Correctional Officer Nicholas Neve as a defendant.

[15] Pickens named "CO Roggensack" as a defendant.  (Doc. 1 at 1).  Based upon the details provided in Pickens's Complaint, Correctional Officer David Roggensack filed a response.  (Doc. 33 at 2 ¶ 6).  Pickens did not dispute he intended to name Correctional Officer David Roggensack as a defendant.

[16] Pickens named "CO Weller" as a defendant.  (Doc. 1 at 1).  Based upon the details provided in Pickens's Complaint, Correctional Officer Chris Weller filed a response.  (Doc. 33 at 2 ¶ 7).  Pickens did not dispute he intended to name Correctional Officer Chris Weller as a defendant.

[17] Because Pickens's claims against the Supervisory Defendants fail, the undersigned does not address the impropriety of Pickens's requested relief against them.

[18] "[F]ederal courts have no authority to address state officials out of office or to fire state employees." *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *rev'd in part on other grounds by Alabama v. Pugh*, 438 U.S. 781 (1978).  Therefore, the court cannot provide the relief requested.  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), *abrogated in part on other grounds by Lewis Casey*, 518 U.S. 343 (1996), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**RECOMMENDS** the court **GRANT** the Supervisory Defendants' motion for summary judgment, (doc. 31), and **DISMISS** Pickens's claims against them **WITH PREJUDICE**.  The Magistrate Judge **FURTHER RECOMMENDS** the court **GRANT** the Correctional Officer Defendants' motion for summary judgment, (doc. 33): as to all official capacity claims for monetary relief; as to the following individual capacity claims for monetary relief – (1) the Eighth Amendment deliberate indifference to serious mental health needs claim against CO Lieber, (2) the Eighth Amendment deliberate indifference to serious medical needs claim against CO McMahan and CO Roggensack, (3) the Eighth Amendment excessive force claim as to CO Neve for the March 5, 2021, incident regarding a takedown due to Pickens charging at another corrections officer, and the March 27, 2021, incident, (4) the Eighth Amendment conditions of confinement claim against CO McMahan, CO Roggensack, and CO Weller, and (5) the First Amendment retaliation claims against CO Lieber and CO Neve; and **DENY** the Correctional Officer Defendants' motion for summary judgment, (doc. 33), as to the individual capacity claims for monetary relief for the Eighth Amendment excessive force claims against (1) CO Lieber for the February 15, 2021, incident, (2) CO Neve for the February 15, 2021, Incident, (3) CO McMahan, CO Roggensack, and CO Weller for the February 20, 2021, incident, (4) CO Andrews for the March 5, 2021, incident; and CO Neve for the March 5, 2021, incident regarding the use of chokehold against Pickens.

# I.   PROCEDURAL HISTORY

Pickens filed his *pro se* complaint on April 18, 2021.[19]  (Doc. 1 at 4).  On October 17, 2022, the undersigned entered an Order for Special Report directing the Clerk of Court to forward copies of the complaint to the defendants.  (Doc. 9 at 1-2, 12).  On January 27, 2023, the Supervisory Defendants filed a special report with supporting evidence.  (Doc. 31).  On February 17, 2023, the Correctional Officer Defendants filed a special report with supporting evidence.  (Doc. 33).  On February 21, 2023, the court construed the defendants' special reports as motions for summary judgment and notified Pickens he had 21 days to respond by filing affidavits or other evidence.  (Doc. 34 at 1).  The court also advised Pickens of the consequences of any default or failure to comply with Rule 56.  (Doc. 34 at 1-2); *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  The court received Pickens's response on March 13, 2023.  (Doc. 38).

This case proceeds before the court on the Supervisory Defendants and the Correctional Officer Defendants' motions for summary judgment, (docs. 31, 33).

---

[19] The Clerk of Court docketed Pickens's complaint on April 29, 2021.  (*See* Doc. 1).  However, under the "prison mailbox rule," because a prisoner proceeding *pro se* has virtually no control over the mailing of a pleading, the court deems the pleading filed at the time the prisoner delivers the pleading to prison or jail officials for mailing.  *See Houston v. Lack*, 487 U.S. 266, 270-72 (1988); *Garvey v. Vaughn*, 993 F.2d 776, 783 (11th Cir. 1993) (extending "*Houston* to pro se prisoners filing complaints in section 1983 cases and claims under the Federal Tort Claims Act").  "Absent evidence to the contrary in the form of prison logs or other records," the court assumes a *pro se* prisoner delivered his pleading to prison authorities the day he signed it.  *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001) (per curiam); *see also Taylor v. Williams*, 528 F.3d 847, 849 (11th Cir. 2008) (assuming *pro se* petitioner delivered his § 2254 habeas petition to prison authorities on the day he signed it).  Pickens dated his complaint April 18, 2021.  (Doc. 1 at 4).

## II. STANDARD OF REVIEW

Because the court construed the defendants' special reports as motions for summary judgment, *Federal Rule of Civil Procedure* 56 governs the motions.  Under Rule 56(a), summary judgment stands proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences against the moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  The moving party has the initial burden of showing there are no genuine issues of material fact and he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The plaintiff has the ultimate burden of proving his claims, so the moving party will be entitled to judgment as a matter of law on any claim unless the plaintiff shows some evidence supporting each element of that claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  As the Supreme Court explained:

> In our view, the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id.*

The non-moving party may establish a genuine issue of material fact through his sworn statement, usually an affidavit, as well as through allegations in a sworn complaint. *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) (citations omitted); *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam) ("Plaintiff alleged specific facts in his sworn complaint and they were required to be considered in their sworn form.")). Unless a party's unsworn statement meets the statutory criteria set forth in 28 U.S.C. § 1746,[20] said statement stands "incompetent to raise a fact issue precluding summary judgment" and a district court may not consider it in evaluating a motion for summary judgment. *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (parallel citation omitted)). Furthermore, a non-moving party "'may not rest upon the mere allegations or denials

---

[20] As the Eleventh Circuit explained:

[U]nder § 1746, a declaration executed within the United States will substitute for a sworn affidavit if the declarant dates and subscribes the document as true under penalty of perjury in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746(2).

In short, § 1746 has these statutory requirements for an unsworn statement to substitute for a sworn affidavit: The declarant must (1) date and sign the document, and (2) subscribe its content as "true," (3) under "penalty of perjury," (4) in substantially the above-quoted pattern language.

*Roy v. Ivy*, 53 F.4th 1338, 1348 (11th Cir. 2022).

of his pleading,'" but must set forth specific facts showing a genuine issue for trial exists. *See Sears*, 922 F.3d at 1207 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Specific facts consist of "non-conclusory descriptions of specific, discrete facts of the who, what, when, and where variety[,]" "describe the external world as [non-movant] observed it at the time[,]" and "are based on [non-movant's] first-hand personal knowledge, not [non-movant's] subjective beliefs." *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) ("[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) (parallel citation omitted)).

"'As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.'" *Sears*, 922 F.3d at 1208 (quoting *Feliciano*, 707 F.3d at 1253); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). In addition, because the plaintiff proceeds *pro se*, the court must construe

8

the complaint more liberally than a pleading drafted by a lawyer. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Roy*, 53 F.4th at 1346. "*Pro se* litigants, however, are required to conform to procedural rules." *Roy*, 53 F.4th at 1346 (citing *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (per curiam)).

### III.  SUMMARY JUDGMENT FACTS

### A.      February 15, 2021, Incident

On February 15, 2021, while housed in restrictive housing cell C-61 at the Limestone Correctional Facility ("Limestone"), Pickens kicked the door of his cell for the second time that morning to get the attention of Correctional Officer Caleb Lieber ("CO Lieber").[21]   (Doc. 1 at 5).  Pickens wished to ask CO Lieber about the matt, bedroll, and toilet paper that Pickens did not receive the previous day when he transferred to the restrictive housing unit.  (Doc. 1 at 5).  When CO Lieber refused to bring Pickens the requested items, Pickens claimed suicidality.  (Doc. 1 at 5).  CO Lieber pepper-sprayed Pickens and slammed Pickens's food door closed.[22]   (Doc. 1 at 5).

---

[21] The Alabama Department of Corrections ("ADOC") employed CO Lieber as a Correctional Officer Senior at Limestone during the relevant timeframe.  (Doc. 33-2 (Lieber Aff.) at 1 ¶ 2).

[22] The February 15, 2021, Incident Report does not indicate CO Lieber pepper sprayed Pickens this first time.  (*See* Doc. 33-2 (Lieber Aff.) at 1-2 ¶¶ 5; Doc. 33-8 at 1).  CO Lieber does not remember the events of February 15, 2021, but does not deny the events as depicted in the Incident Report.  (*See* Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5).

When Officer Jessie Pollard interviewed Pickens concerning the February 15, 2021, incident on June 29, 2021, Pickens recounted the facts as follows:

Inmate Pickens stated that he started kicking on his door at approximately 0100 hours on February 15, 2021, and CO Lieber came to his cell door and told Inmate Pickens to give him a minute and CO Lieber would get him a mat and blanket. Inmate Pickens

Twenty minutes later, Pickens again kicked his door.  (Doc. 1 at 5).  When CO Lieber arrived at Pickens's cell, he opened the tray door to Pickens's cell to speak with Pickens.[23]  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶¶ 5; Doc. 33-8 at 1).   Pickens requested a body chart, asked to speak to a supervisor, and again expressed suicidality to CO Lieber. (Doc. 1 at 5).  CO Lieber pepper-sprayed Pickens a second time.[24]  (Doc. 1 at 5; Doc. 33-8 at 1).

CO Lieber reported the second pepper spraying incident to Sergeant Bryan

---

stated that he started kicking on his door again at approximately 0130 hours and asked CO Lieber for a mat and blanket, and CO Lieber sprayed him in his face with chemical agent. Inmate Pickens later stated that it was an hour before he started kicking the door again and CO Lieber returned to his cell and sprayed him. Inmate Pickens' stated that he started kicking on his cell door again because he could not breathe and asked to see a supervisor. After about 15-20 minutes, CO Lieber returned to Inmate Pickens' cell and sprayed him a second time. Inmate Pickens later said he asked to see a supervisor after CO Lieber sprayed him the second time. Inmate Pickens said CO Lieber eventually called a supervisor to take him to the Healthcare Unit, and after about 35 to 45 minutes they arrived to escort him to the Healthcare Unit.

(Doc. 33-8 at 11).  Officer Pollard concluded the Inmate Body Chart dated February 15, 2021, at 0132 hours contradicted Pickens's timeline.  (Doc. 33-8 at 11).  Officer Pollard ultimately concluded CO Lieber justifiably used force against Pickens on February 15, 2021.  (Doc. 33-8 at 12).

[23] The February 15, 2021, Duty Officer Report indicates that Pickens refused CO Lieber's direct order to stop hitting the cell door window.  (Doc. 33-8 at 3).  In his affidavit, Lieber affirmatively states the records support that he pepper-sprayed Pickens "to get Pickens to move his arm."  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶¶ 5).  In addition, the February 15, 2021, Incident Report and accompanying documents indicate Pickens hit CO Lieber with the tray door.  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶¶ 5; Doc. 33-8 at 1, 8-10).  Pickens denies he "assault[ed]" CO Lieber.  (*See* Doc. 38 at 2, 3).  However, as explained in footnote 36, Pickens received a disciplinary for doing so, (doc. 33-8 at 25-36), and may not challenge that finding via his Eighth Amendment claim for excessive force.

[24] The February 15, 2021, Incident Report and accompanying documents indicate Pickens refused CO Lieber's repeated verbal commands to remove his arm from the tray flap so that CO Lieber could close the tray door.  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶¶ 5; Doc. 33-8 at 1).  Pickens denies he "attempt[ed] to keep [CO Lieber] from closing [the] trapdoor."  (Doc. 38 at 3).  Pickens did not receive a disciplinary infraction for the refusal to obey this order.  (*See* Doc. 33-8 at 13-48).

Moore.  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5; Doc. 33-8 at 1).  Correctional Officer Nicholas Neve ("CO Neve")[25] and Sergeant Moore placed Pickens in restraints and escorted Pickens to the medical unit for decontamination from the pepper spray.  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5; Doc. 33-4 (Neve Aff.) at 1; Doc. 33-8 at 1; *see also* Doc. 1 at 5).  While taking Pickens outside, CO Neve grabbed Pickens by the back of his neck and rammed Pickens's head into the wall twice.[26]  (Doc. 1 at 5).

Upon arrival at medical, Pickens demanded to speak with Captain Errol Pickens, (doc. 33-8 at 1), and reported what happened to Lieutenant Hanswer Whitfield ("Lt. Whitfield")[27] and Lieutenant Steven Howell ("Lt. Howell"),[28] (doc. 1 at 5).[29] Pickens

---

[25] ADOC employed CO Neve as a Correctional Officer Senior at Limestone during the relevant timeframe.  (Doc. 33-4 (Neve Aff.) at 1).

[26] CO Neve denies grabbing Pickens by the back of his neck and denies slamming his head into the wall.  (Doc. 33-4 (Neve Aff.) at 1).  The February 15, 2021, Incident Report does not reflect Pickens's allegations.  (*See* Doc. 33-8 at 1-2).  When Officer Jessie Pollard interviewed Pickens concerning the February 15, 2021, incident, Pickens recounted that CO Neve hit Pickens's head on the sliding door two or three times and commanded Pickens to "stop resisting" as they entered the lobby of Restrictive Housing Unit C.  (Doc. 33-8 at 11).  Pickens further stated that when he slipped and fell, CO Neve had him by the back of his neck and hit Pickens's head on the sliding door as he picked Pickens up.  (Doc. 33-8 at 11).  Officer Pollard made no finding as to this incident.  (*See* Doc. 33-8 at 12).  Pickens contends the pictures taken on February 15, 2021, support his account as they depict "huge knot on the right and left sides of [his] forehead."  (Doc. 38 at 2).  The pictures possibly support Pickens's account as they show discoloration of Pickens's forehead.  (*See* Doc. 33-8 at 5).

[27] ADOC employed Lt. Whitfield as a Correctional Lieutenant at Limestone during the relevant timeframe.  (Doc. 31-7 (Whitfield Declr.) at 1 ¶ 2).

[28] ADOC employed Lt. Howell as a Correctional Sergeant at Limestone during the relevant timeframe.  (Doc. 31-8 (Howell Declr.) at 1 ¶ 2).

[29] The February 15, 2021, Incident Report reflects Sergeant Moore reported the incident to Lt. Whitfield, who reported the incident to Captain James Smith, Warden II Scarlet Robinson, and Law Enforcement Services Division Leroy Dale.  (Doc. 33-8 at 1-2).  Use of Force Review Officer Jessie

refused to provide a statement regarding the alleged use of force.  (Doc. 33-8 at 7; *see also* Doc. 33-8 at 1).

While an LPN documented Pickens's physical condition on a Body Chart around 1:32 a.m., Pickens remarked, "They sprayed me because I wanted to go [on] suicide." (Doc. 33-8 at 4).[30]  Pickens's Body Chart indicates no physical injuries.  (*See* Doc. 33-8 at 4).  The LPN issued an emergency mental health referral on behalf of Pickens around 1:34 a.m. and notified Dr. Dutton.  (Doc. 33-12 at 58).  Dr. Dutton gave verbal orders to place Pickens on Constant Observation in "Receiving" about 2:00 a.m.  (Doc. 33-12 at 51-52).  Mental health staff placed Pickens on Constant Observation around 2:45 a.m.  (Doc. 33-12 at 29-30).  Dr. Dutton released Pickens from Constant Observation around 11:40 a.m. that morning as Pickens "[did] not meet crisis cell admission criteria." (Doc. 33-12 at 52; *see also* Doc. 33-12 at 30, 50, 55-57).

Pickens reported the February 15, 2021, incident in writing to Warden Deborah

---

Pollard opened an investigation into the February 15, 2021, use of force incident.  (*See* Doc. 33-8 at 11-12).

[30] Pickens denies he verbally threatened CO Neve while in the Infirmary.  (*See* Doc. 38 at 1). The Incident Report reflects Pickens told Neve Pickens would "Beat the fuck out of you if take these cuffs off me" and "I'll crank this bitch up in here."  (Doc. 33-8 at 1).  Pickens then stood up from the exam table and threatened to spit in CO Neve's face.  (Doc. 33-8 at 1).  As explained in footnote 36, Pickens received a disciplinary for threatening CO Neve, (doc. 33-8 at 37-48), and may not challenge that finding via his Eighth Amendment claim for excessive force.

Toney ("Warden Toney"),[31] Warden William Streeter ("Warden Streeter"),[32] Captain

James Smith ("Captain Smith"),[33] Warden Errol Pickens ("Warden Pickens"),[34] and

Captain Shannon Caldwell ("Captain Caldwell").[35]  (Doc. 1 at 5).  Pickens requested a

transfer out of C-Dorm because he feared for his life.  (Doc. 1 at 5).

As a result of the February 15, 2021, incident, ADOC found Pickens guilty of

the following disciplinary infractions: (1) Failure to obey a direct order of an ADOC

Employee for Pickens's refusal to stop hitting his cell door window which disrupted

normal operations, (doc. 33-8 at 13-24); (2) Assault on a person associated with ADOC

for kicking his tray flap door causing it to hit CO Lieber in the hand, (doc. 33-8 at 25-

36); and (3) Threat for threatening bodily harm to CO Neve, (doc. 33-8 at 37-48).[36]

---

[31] ADOC employed Warden Toney as the Correctional Warden III at Limestone during the relevant timeframe.  (Doc. 31-1 (Toney Declr.) at 1 ¶ 2).

[32] ADOC employed Warden Streeter as the Correctional Warden I at Limestone during the relevant timeframe.  (Doc. 31-2 (Streeter Declr.) at 1 ¶ 2).

[33] ADOC employed Captain Smith as a Correctional Captain at Limestone during the relevant timeframe.  (Doc. 31-3 (Captain Smith Declr.) at 1 ¶ 2).

[34] ADOC employed Warden Pickens as a Correctional Captain at Limestone during the relevant timeframe.  (Doc. 31-4 (Warden Pickens Declr.) at 1 ¶ 2).

[35] ADOC employed Captain Caldwell as a Correctional Lieutenant at Limestone during the relevant timeframe.  (Doc. 31-6 (Caldwell Declr.) at 1 ¶ 2).

[36] Pickens's factual allegations in his sworn complaint do not stand barred by the Eleventh Circuit's ruling in *O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011), which held "[i]f a prisoner is found guilty of an actual disciplinary infraction after being afforded due process and there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction in a disciplinary report." *Id.* at 1215. "To find otherwise, would render the prison disciplinary system impotent by inviting prisoners to petition the courts for a full retrial each time they are found guilty of an actual disciplinary infraction after having filed a grievance." *Id.* at 1216.

13

On July 12, 2021, Officer Pollard found that CO Lieber justifiably used force on Pickens on February 15, 2021.  (Doc. 33-8 at 12).

## B.      February 20, 2021, Incident

On February 20, 2021, around 6:15 a.m., while housed in restrictive housing cell C-61, Pickens informed Correctional Officer David Roggensack ("CO Roggensack") he needed medical attention due to bad chest pains.[37]  (Doc. 1 at 5).  Pickens told CO Roggensack he had been stabbed in the chest with an ice pick and showed CO Roggensack the wound.  (Doc. 1 at 5).  Although CO Roggensack said he would obtain assistance, when Pickens awoke approximately four hours later after passing out from pain, he remained alone in his cell.  (Doc. 1 at 5).

Upon that awakening around 10:30 a.m., Pickens kicked his cell door to get help. (Doc. 1 at 5).  Correctional Officer Phillip McMahan ("CO McMahan") came to

---

Pickens does not challenge his disciplinary findings, and the success of his Eighth Amendment claims do not depend upon a finding that the disciplinary findings stand incorrect.  *See Sears v. Roberts*, 922 F.3d 1199, 1206-07 (11th Cir. 2019) (finding plaintiff's claim for excessive force did not fall within the *O'Bryant* exception because he "d[id] not challenge the disciplinary panel's finding that he violated a prison rule, nor d[id] the success of his Eighth Amendment claims depend on a finding that the disciplinary panel's decision was wrong").  CO Lieber specifically contends he administered pepper spray "to get Pickens to move his arm."  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5).  Pickens did not receive a disciplinary infraction for his refusal to obey CO Lieber's command to move his arm from his cell's tray slot; rather, he received a disciplinary infraction for assaulting CO Lieber.  (*See* Doc. 33-8 at 13-48).  As such, he may contend in this lawsuit that he did not prevent CO Lieber from closing the tray slot by placing his arm through the opening.  *See Sears*, 922 F.3d at 1206-07.

[37] ADOC currently employs CO Roggensack as a Correctional Sergeant at Limestone.  (Doc. 33-5 (Roggensack Aff.) at 1).

Pickens's cell door in response.[38]   (Doc. 1 at 5).   Pickens asked CO McMahan for transport to the medical unit because he had passed out.  (Doc. 1 at 5).  After some back and forth between the two, CO McMahan told Pickens he would not receive transport to the medical unit.  (Doc. 1 at 5).  Pickens requested a supervisor, but CO McMahan refused.  (Doc. 1 at 5).  Pickens told CO McMahan he felt like he was having a heart attack.  (Doc. 1 at 5).  CO McMahan told Pickens to die, slammed Pickens's window flap closed, and left.  (Doc. 1 at 5).

After CO McMahan refused to transport Pickens to obtain medical attention, Pickens lit afire a roll of tissue in his cell to create smoke to secure a supervisor's attention.  (Doc. 1 at 5).  After Pickens's cell filled with smoke, he threw the roll of tissue in the toilet and flushed it.  (Doc. 1 at 5).  Correctional Officer Chris Weller ("CO Weller"),[39] CO McMahan, and CO Roggensack responded to the fire.  (Doc. 1 at 5-6).  Although the officers had access to three fire extinguishers[40] located in Pickens's dorm, COs Weller, McMahan, and Roggensack brought a water hose.  (Doc. 1 at 6).  When Pickens informed COs Weller, McMahan, and Roggensack that he had already put the fire out, they sprayed Pickens in the face with the water hose.  (Doc. 1 at 6).  Pickens

---

[38] ADOC employed CO McMahan as a Correctional Officer Senior at Limestone during the relevant timeframe.  (Doc. 33-3 (McMahan Aff.) at 1).

[39] ADOC employed CO Weller as a Correctional Officer Senior at Limestone during the relevant timeframe.  (Doc. 36-1 (Weller Aff.) at 1 ¶ 2).

[40] COs McMahan and Roggensack contend no Housing Units have three fire extinguishers. (Doc. 33-3 (McMahan Aff.) at 1; Doc. 33-5 (Roggensack Aff.) at 1).

tried to move away from the water, but CO McMahan chased Pickens around the cell continuing to spray him. (Doc. 1 at 6). COs Weller, McMahan, and Roggensack then handcuffed Pickens with too-tight belly chains and leg irons that cut his wrist and ankles. (Doc. 1 at 6). They then took Pickens, still soaking wet, outside in the snow and put him in a walk cage where he remained for approximately an hour.[41] (Doc. 1 at 6). Pickens urinated on himself after CO Weller refused four or five times to free Pickens from the cage to use a restroom.[42] (Doc. 1 at 6).

---

[41] Pickens contends they left him in the walk cage for "hours." (Doc. 1 at 6). However, Pickens could not have been in the walk-cage that long by his own account. (*See* doc. 1 at 5). Pickens alleged he awoke at 10:30 a.m. and kicked on his cell door. CO McMahan then came to Pickens's cell door. After a verbal exchange between the two, CO McMahan refused to take Pickens to seek medical attention. Pickens then lit a fire in his cell to secure the attention of a supervisor. After Pickens's cell filled with smoke, he extinguished the fire. CO McMahan, CO Roggensack, and CO Weller responded to the fire with a water hose. Then they chained Pickens up and took him to the walk cage. Pickens's medical records indicate medical personnel interacted with Pickens around noon that day. (*See* doc. 33-11 at 69-70). Based upon this chronology, the undersigned estimates Pickens remained in the walk cage for an hour at most. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[42] CO Weller does not recall Pickens or the events of February 20, 2021. (Doc. 36-1 (Weller Aff.) at 1 ¶¶ 4-5). COs McMahan and Roggensack contend the events of February 20, 2021, could not have happened. (*See* Doc. 33-3 (McMahan Aff.) at 1; Doc. 33-5 (Roggensack Aff.) at 1). They contend Pickens was not in the Housing Unit but in the Receiving Unit on crisis on February 20, 2021. (*See* Doc. 33-3 (McMahan Aff.) at 1; Doc. 33-5 (Roggensack Aff.) at 1). Pickens alleges the incident began around 10:30 a.m. on February 20, 2021. (*See* Doc. 1 at 5-6). The February 20, 2021, Nursing Progress Note indicates Pickens's placement on Constant Watch in Receiving at 12:00. (*See* Doc. 33-11 at 69). The February 20, 2021, Duty Post Logs record the following entry time-stamped 1:51 PM: "Travis Pickens (B/250075) house Receiving for Constant Watch; per MHP Clifford." (Doc. 33-9 at 9). Therefore, the facts as alleged by Pickens could have occurred.

The undersigned notes ADOC's inmate record management system (IMAS), contains no documents relating to the February 20, 2021, incident such as a duty officer report, incident report, body chart, or disciplinary charges. (Doc. 33-7 (Crabtree Aff.) at 1 ¶ 2). ADOC Policy would require the completion and filing of a duty officer report, incident report, body chart to record any injuries, and a disciplinary charge against Pickens for starting the fire and/or any other inmate who had caused

On February 20, 2021, upon arrival at medical, Pickens reported the foregoing events to Sergeant Joshua Beaty ("Sgt. Beaty")[43] and Sergeant Luther Smith ("Sgt. Smith").[44]  (Doc. 1 at 6).

On February 20, 2021, at 12:00 noon, Pickens remarked to an "RN," "OK" and "I'm suicidal."  (Doc. 33-11 at 69-70).  The same RN triggered an urgent mental health referral on behalf of Pickens and notified "Clifford."  (Doc. 33-11 at 70).  "[P]er Clifford," the RN placed Pickens on Constant Watch in Receiving.[45]  (Doc. 33-11 at 70; *see also* Doc. 33-11 at 69).  The RN noted no signs or symptoms of distress at that time.  (Doc. 33-11 at 69).  The medical records do not contain a Body Chart dated February 20, 2021.[46]

---

injuries or other damage, if the incident alleged by Pickens occurred.  (Doc. 33-7 (Crabtree Aff.) at 2 ¶ 3).  In addition, the Duty Post Logs for February 20, 2021, contain no reference to the events Pickens alleged happened.  (See Doc. 33-9 at 1-14).

[43] ADOC employed Sgt. Beaty as a Correctional Sergeant at Limestone during the relevant timeframe.  (Doc. 31-9 (Beaty Declr.) at 1 ¶ 2).

[44] ADOC employed Sgt. Smith as a Correctional Sergeant at Limestone during the relevant timeframe.  (Doc. 31-10 (Sgt. Smith Declr.) at 1 ¶ 2).

[45] As chronicled previously, the February 20, 2021, Nursing Progress Note indicates Pickens was on Constant Watch in Receiving at 12:00.  (*See* Doc. 33-11 at 69).  Further, the February 20, 2021, Duty Post Logs record the following entry time-stamped 1:51 PM: "Travis Pickens (B/250075) house Receiving for Constant Watch; per MHP Clifford."  (Doc. 33-9 at 9).

[46] Pickens contends someone tampered with his medical file, and further, his February 20, 2021, Body Chart stands missing.  (*See* Doc. 38 at 3 ¶ 4).  Pickens remembers informing the nurse completing the body chart that he "got sprayed with the water hose[,]" "put in the snow in the walking cage," and urinating on himself.  (*See* Doc. 38 at 3 ¶ 4).  The records before the undersigned do not contain a Body Chart dated February 20, 2021.  (*See generally* Doc. 33-11; Doc. 33-12).

Neither does the record contain Constant Observation logs from February 20, 2021.  (*See generally* Doc. 33-11; Doc. 33-12).  The medical records do contain the watch logs from Pickens's

Case 5:21-cv-00610-ACA-HNJ   Document 45   Filed 07/31/23   Page 18 of 76

The next morning, on February 21, 2021, at 7:45 a.m. Pickens reported to mental

health professional B. Clifford that "yesterday 'they' (ADOC) sprayed me with a water

hose and left me outside for hours." [47]  (Doc. 33-12 at 22).  Pickens did not mention

his stab wound or ask for medical attention.  (*See* Doc. 33-12 at 22).  Clifford noted "it

is cold outside."  (Doc. 33-12 at 22).  Clifford placed Pickens on non-acute suicide

watch ("NASW"), (*see* doc. 33-12 at 22; doc. 33-12 at 68), where he remained until Dr.

Rogers released him to ADOC custody on February 27, 2021, at 1:00 p.m. (*see* doc. 33-

---

[47] placement on non-acute suicide watch ("NASW") beginning February 21, 2021, at 6:55 p.m., (doc. 33-11 at 71-74; doc. 33-12 at 1-11), but not the Constant Observation logs, (*see generally* doc. 33-11; doc. 33-12).  Given that the medical records contain the Constant Observation Logs from Pickens's February 15, 2021, placement on Constant Observation, (doc. 33-12 at 29-30), the undersigned would also expect to see Constant Observation logs from February 20, 2021, beginning around noon until his placement on NASW.  These records might shed light on Pickens's allegations regarding the tampering of his file.  These records may also shed light on the allegations in Pickens's complaint.  For example, they may notate whether Pickens was wet at the time.  Although the records contain the watch logs from Pickens's placement on non-acute suicide watch ("NASW") beginning February 21, 2021, at 6:55 p.m., (doc. 33-11 at 71-74; doc. 33-12 at 1-11), it does not contain the Constant Observation logs from February 20 and February 21, (*see generally* doc. 33-11; doc. 33-12).  It remains unclear why the records indicate mental health professional Clifford placed Pickens on NASW beginning 7:54 a.m., but the NASW logs do not begin until 6:55 p.m.  (*Compare* Doc. 33-12 at 22 (Progress Note with a time entry of 7:45 a.m.) and Doc. 33-12 at 68 (Health Services Communication Form placing Pickens on NASW "per LMHP @ 7:54 am.") *with* Doc. 33-11 at 71-74; Doc. 33-12 at 1-11 (NASW logs indicating NASW began at 6:55 p.m.)).

[47] Pickens also bemoans the absence of documentation concerning his interaction with MHP Clifford when she placed Pickens in the crisis cell after the February 20, 2021, Incident.  (*See* Doc. 38 at 3 ¶ 4).  However, the records before the undersigned contain a Progress Note from MHP Clifford dated February 21, 2021, at 7:45 a.m., wherein she placed Pickens on non-acute suicide watch ("NASW").  (Doc. 33-12 at 22).  MHP Clifford attempted to speak with Pickens cell side in the receiving unit.  (Doc. 33-12 at 22).  When Pickens refused to come out for the assessment, she placed Pickens on NASW.  (Doc. 33-12 at 22; Doc. 33-12 at 68 (Health Services Communication Form placing Pickens on NASW "per LMHP @ 7:54 am.")).  This appears to be the documentation to which Pickens refers.

12 at 12; doc. 33-11 at 71).

On February 26, 2021, at 0700, while on NASW, Pickens complained to an RN about spasms in his back/chest "where stab wounds were". (Doc. 33-11 at 58). The RN indicated Pickens did not exhibit any signs or symptoms "of acute distress." (Doc. 33-11 at 58). There exists no indication the RN sought medical treatment for Pickens at that time. (*See* Doc. 33-11 at 58; *see generally* Doc. 33-11; Doc. 33-12). Roughly two hours later, Pickens met with a mental health professional and did not complain of pain in his back/chest at that time. (*See* Doc. 33-12 at 14). Photographs taken 13 days later following an alleged excessive force incident on March 5, 2021, do not portray evidence of a recent stab wound to Pickens's chest or back. (*See* Doc. 33-10 at 9, 15). However, the photographs do not depict Pickens's entire back and chest. (*See* Doc. 33-10 at 9, 15).

Pickens reported the February 20, 2021, incident in writing to Warden Toney, Warden Streeter, Captain Smith, Warden Pickens, and Captain Caldwell, and mental health supervisor Mr. Bell.[48] (Doc. 1 at 6). Prior to February 20, 2021, Pickens had requested a transfer out of C-Dorm due to a fear for his life and the writing of fake disciplinaries by correctional officers. (Doc. 1 at 6).

## C.    March 5, 2021, Incident

On March 5, 2021, while housed in restrictive housing cell C-58, Correctional

---

[48] Pickens did not name Mr. Bell as a defendant in this lawsuit. (*See* Doc. 1 at 1).

Officer Alex Andrews ("CO Andrews")[49] and CO Neve went to Pickens's cell door and threatened to spray Pickens if he kicked on his door.  (Doc. 1 at 6).  Later that day, CO Andrews and CO Neve started the showers on the wrong end of the dorm, and several inmates began kicking their cell doors in protest.  (Doc. 1 at 6).  Although Pickens did not kick his cell door,[50] CO Andrews[51] opened Pickens's food trap and pepper sprayed him.  (Doc. 1 at 6; *see also* Doc. 33-10 at 1).  Pickens asked to speak to a supervisor and requested a body chart.  (Doc. 1 at 6).  CO Andrews "radioed for a Supervisor."[52]

CO Neve handcuffed Pickens.  (Doc. 33-10 at 1).  While CO Neve and CO

---

[49] ADOC employed CO Andrews as a Correctional Officer at Limestone during the relevant timeframe.  (Doc. 33-1 (Andrews Aff.) at 1 ¶ 2).

[50] The Incident Report reflects Pickens disobeyed several direct orders to stop striking the window in his cell door.  (Doc. 33-10 at 1).  Pickens denied he kicked his door.  (Doc. 1 at 6).

[51] Pickens's complaint declared both CO Andrews and CO Neve pepper-sprayed him.  (*See* Doc. 1 at 6).  In addition, Pickens told Officer Smith, the officer who investigated the March 5, 2021, incident, that he believed CO Neve told him to stop beating on his door and pepper-sprayed him.  (Doc. 33-10 at 3).  Pickens also told Officer Smith his "window and tray hole were closed."  (Doc. 33-10 at 3).  Although CO Andrews does not remember the March 5, 2021, events, he does not dispute that he pepper-sprayed Pickens "to get him to stop beating his door and harming State property."  (Doc. 33-1 (Andrews Aff. at 1-2 ¶¶ 5-7).  As Pickens only alleged one pepper spray incident at this time; Pickens was behind a cell door, which rendered it nearly impossible to ascertain which officer sprayed him; and CO Andrews does not dispute he pepper-sprayed Pickens, the undersigned concludes CO Neve did not pepper spray Pickens on March 5, 2021, through his cell trap door.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[52] CO Andrews asserts he followed standard procedure regarding the March 5, 2021, incident: After he pepper-sprayed Pickens, he disengaged from the situation and the other officer present called the Supervisor.  (*See* Doc. 33-1 at 2 ¶ 8).  If the Supervisor advised the other officer to take Pickens to health services, then they would have taken Pickens to health services for decontamination.  (*See* Doc. 33-1 (Andrews Aff.) at 2 ¶ 8).

Andrews escorted Pickens to the Infirmary, Pickens pulled away from CO Neve and attempted to reach CO Andrews.  (Doc. 33-4 (Neve Aff.) at 1; *see also* Doc. 33-10 at 1). CO Neve pepper-sprayed Pickens, made Pickens drop to his knees, kicked Pickens in the back, and made Pickens put his face in the dirt.[53]  (Doc. 1 at 6; *see also* Doc. 33-8 at 1).  CO Neve then told Pickens he "better stop" lodging complaints about him "because no one care[d]."  (Doc. 1 at 6).   Sergeant Jeremy Pelzer arrived on the scene and assumed control of the escort.  (Doc. 33-10 at 1).

While handcuffed in the medical unit, Pickens proceeded to spit pepper spray out of his mouth and blow it out of his nose while sitting on a bench.  (Doc. 1 at 6-7). Pickens's discharge hit CO Neve, who entered the unit to decontaminate himself, in the abdomen and face.  (Doc. 33-4 (Neve Aff.) at 1 *see also* Doc. 33-10 at 1).  CO Neve "clotheslined" Pickens off the bench and choked Pickens from behind until he "blacked out."[54]  (Doc. 1 at 7).  Correctional officers had to pull CO Neve off Pickens.  (Doc. 1 at 7).

Pickens refused a body chart, which would have documented any physical injuries, stating, "I don't need medical."  (Doc. 33-10 at 5; *see also* Doc. 33-10 at 1).  The photographs taken on March 5, 2021, depict dirt on Pickens's shirt, (doc. 33-10 at 6),

---

[53] CO Neve admits he took Pickens to the ground to gain compliance.  (Doc. 33-4 (Neve Declr.) at 1).

[54] CO Neve admits he again took Pickens to the ground to stop Pickens from continuing to assault CO Neve with bodily fluids.  (Doc. 33-4 (Neve Declr.) at 1).

and apparently minor abrasions to Pickens's face, (doc. 33-10 at 10, 16-17).  Pickens refused to provide a written statement concerning the March 5, 2021, incident.  (*See* Doc. 33-10 at 1).

Sergeant Pelzer notified Law Enforcement Services Division Agent Kelley Smith, Warden Toney, and Regional Director Edward Ellington of the incident.  (Doc. 33-8 at 1).

Pickens reported the March 5, 2021, incident in writing to Warden Toney, Warden Streeter, Captain Smith, Warden Pickens, Captain Caldwell, and mental health supervisor Mr. Bell.  (Doc. 1 at 7).  Prior to the March 5, 2021, incident, Pickens had requested a transfer out of C-Dorm on two previous occasions because CO Neve kept assaulting Pickens and Pickens feared for his life when CO Neve worked.  (Doc. 1 at 7).

On March 18, 2021, Officer James Smith concluded CO Andrews and CO Neve justifiably used force against Pickens on March 5, 2021.  (Doc. 33-10 at 3).

**D.    March 27, 2021, Incident**

On March 27, 2021, CO Neve and CO Lieber escorted Pickens and his cellmate to shower.  (Doc. 1 at 7).  While Pickens showered, CO Neve and CO Lieber stood nearby calling Pickens a "snitch" and a "pussy" because Pickens wrote the wardens and

the captains to complain about them.[55]  (Doc. 1 at 7).  When Pickens responded that he would not have to write the wardens and captains if CO Neve and CO Lieber would stop assaulting and pepper spraying him, CO Neve told Pickens he was a "faggot" and a "snitch."  (Doc. 1 at 7).  CO Lieber told Pickens he must be a "prison sissy" because he had such a "nice ass."  (Doc. 1 at 7).  As CO Lieber and CO Neve walked away, CO Neve loudly proclaimed Pickens was a snitch.  (Doc. 1 at 7).  Pickens's cellmate and another inmate heard all of the foregoing exchange.  (Doc. 1 at 7).

While on the way back to their cell after showering, Pickens and his roommate saw Lt. Howell in the cube.  (Doc. 1 at 7).  When Pickens asked Lt. Howell if they could speak, CO Neve grabbed Pickens by the arm and forced Pickens to walk up the stairs to his cell.  (Doc. 1 at 7).  When they arrived at Pickens's cell, CO Neve removed Pickens's handcuffs through the food trap and then pushed Pickens forward on his buttocks.[56]  (Doc. 1 at 7).  Pickens's cellmate witnessed the incident.  (Doc. 1 at 7).

Pickens reported the March 27, 2021, incident in writing to Warden Toney, Warden Streeter, Captain Smith, and Warden Pickens.  (Doc. 1 at 8).  Pickens also reported the March 27, 2021, incident to PREA Lieutenant Michael Coady ("PREA Lt.

---

[55] CO Neve avers he "had no incident" with Pickens on March 27, 2021.  (Doc. 33-4 (Neve Aff.) at 2).  CO Lieber does not recall the events of March 27, 2021, but contends he maintained a practice of not speaking to prisoners while they showered.  (Doc. 33-2 (Lieber Aff.) at 2 ¶¶ 6-8).

[56] CO Neve avers he "had no incident" with Pickens on March 27, 2021, and denies pushing Pickens on his buttocks.  (Doc. 33-4 (Neve Aff.) at 2).

Coady"),[57] Captain Caldwell, and Mr. Dutton in mental health.[58]   (Doc. 1 at 7).   PREA

Lt. Coady did not see Pickens even though Pickens rendered a statement about the

incident on a request form he gave to Mr. Dutton to give to PREA Lt. Coady.   (Doc. 1

at 7-8).

In addition to reporting the February 15, February 20, March 5, and March 27

incidents to Warden Toney, Warden Streeter, Captain Smith, Warden Pickens, PREA

Lt. Coady, Captain Caldwell, Lt. Whitfield, Lt. Howell, Sgt. Beaty, and Sgt. Smith in

writing, Pickens also informed them verbally at "seg board" that he feared for his life

in C-Dorm because staff continually harassed and assaulted him.   (Doc. 1 at 8).   Pickens

requested a transfer.   (Doc. 1 at 8).

The Supervisory Defendants do not remember any of the alleged incidents

Pickens set forth in his complaint and do not remember receiving any inmate request

slips or other communications from Pickens expressing that Pickens feared for his

safety at Limestone because of the alleged incidents.   (Doc. 31-1 (Toney Decl.) at 2 ¶ 4;

Doc. 31-2 (Streeter Decl.) at 2 ¶ 4; Doc. 31-3 (Captain Smith Decl.) at 2 ¶ 4; Doc. 31-4

(Warden Pickens Decl.) at 2 ¶ 4; Doc. 31-5 (Coady Decl.) at 2 ¶ 4; Doc. 31-6 (Caldwell

Decl.) at 2 ¶ 4; Doc. 31-7 (Whitfield Decl.) at 2 ¶ 4; Doc. 31-8 (Howell Decl.) at 2 ¶ 4;

---

[57] ADOC employed PREA Lt. Coady at Limestone as a Correctional Lieutenant designated the Facility Institutional PREA Compliance Manager during the relevant timeframe.   (Doc. 31-5 (Coady Declr.) at 1 ¶ 2).

[58] Pickens did not name Dr. Dutton as a defendant in this action.   (*See* Doc. 1 at 1).

Doc. 31-9 (Beaty Decl.) at 2 ¶ 4; Doc. 31-10 (Sgt. Smith Decl.) at 2 ¶ 4).  Neither could Warden Streeter, Captain Smith, Captain Caldwell, Lt. Whitfield, Lt. Howell, or Sgt. Beaty locate any inmate request slips or other communications from Pickens expressing Pickens feared for his safety at Limestone because of the alleged incidents.  (Doc. 31-2 (Streeter Decl.) at 2 ¶ 4; Doc. 31-3 (Captain Smith Decl.) at 2 ¶ 4; Doc. 31-6 (Caldwell Decl.) at 2 ¶ 4; Doc. 31-7 (Whitfield Decl.) at 2 ¶ 4; Doc. 31-8 (Howell Decl.) at 2 ¶ 4; Doc. 31-9 (Beaty Decl.) at 2 ¶ 4).

Pickens avers he "filed complaints on paper to all Supervisory Defendants [himself]."  (Doc. 38 at 1).  When Pickens asked Warden Streeter or Captain Pickens whether they received his complaints at "seg board" on Wednesdays, they responded they did not.  (Doc. 38 at 1).  Pickens re-wrote his complaints and gave them to Dr. Bell, the mental health supervisor, to make copies for Pickens's mental health file.  (Doc. 38 at 1).  Dr. Bell then gave copies to the Supervisory Defendants.  (Doc. 38 at 1).  Pickens further avers he told his lawyer about the February 5 and February 20 incidents during a phone call the last of week of February.  (Doc. 38 at 1-2).  His attorney then spoke to Warden Streeter, who transferred him to Captain Smith.  (Doc. 38 at 2).  Captain Smith brought Pickens a complaint form.  (Doc. 38 at 2).  Pickens met with I&I in June or July.  (Doc. 38 at 2).

## IV. ANALYSIS

### A.    Official Capacity Claims

The doctrine of sovereign immunity precludes Pickens's constitutional claims to

the extent he sues each defendant in his official capacity.  The Eleventh Amendment to the United States Constitution bars 42 U.S.C. § 1983 claims against the state or an agency of the state.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Likewise, Eleventh Amendment immunity also bars claims for monetary damages brought against officials and employees of state entities sued in their official capacities.  *Id.* at 101-03.  Therefore, Pickens's claims against each defendant in his official capacity warrant dismissal.

**B.    Eighth Amendment Deliberate Indifference to Pickens's Serious Mental Health Needs**

Pickens asserts an Eighth Amendment claim for deliberate indifference to his serious mental health needs against CO Lieber based on the February 15, 2021, Incident.  (*See* Doc. 1 at 5).

Under the Eighth Amendment, prisoners have a right to be protected from self-harm, including suicide.  *See Edwards v. Gilbert*, 867 F.2d 1271, 1274 (11th Cir. 1989).  "In a prisoner [self-harm or] suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's [risk of self-harm or] taking of his own life."  *Id.*  at 1274-75 (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983)).  "The deliberate indifference standard is met only if there were a strong likelihood, rather than a mere possibility, that self-infliction of harm would result."  *Edwards*, 867 F.2d at

1276 (internal quotation marks and citations omitted).

According to Pickens's account, he twice told CO Lieber of his suicidality on February 15, 2021.  The first occasion occurred after CO Lieber refused to bring Pickens the mat, bedroll, and toilet paper Pickens requested.  (Doc. 1 at 5).  Twenty minutes later, Pickens again expressed suicidality to CO Lieber.  (Doc. 1 at 5).  Pickens contends CO Lieber pepper-sprayed him both times he expressed suicidality. (Doc. 1 at 5; Doc. 33-8 at 1).

The record stands devoid of evidence Pickens exhibited a strong likelihood he would engage in self-harm on February 15, 2021.  First, Pickens does not allege he engaged in self-harm or attempted to engage in self-harm after CO Lieber left him unattended for about 20 minutes, (*see* doc. 1 at 5; doc. 38), and the Body Chart completed shortly after the second pepper-spraying incident indicates no physical injuries, self-inflicted or otherwise, (*see* doc. 33-8 at 4).

Second, given that Pickens claimed suicidality immediately following CO Lieber's refusal to supply Pickens with a mat, bedroll, and toilet paper, CO Lieber sustained reason to doubt the sincerity of Pickens's claims.  (*See* Doc. 1 at 5). Buttressing this observation, Dr. Dutton ultimately found Pickens did not meet the criteria for crisis cell admission and released Pickens back to ADOC custody following Pickens's discharge from Constant Observation.  (Doc. 33-12 at 52; *see also* Doc. 33-12 at 30, 50, 55-57).

Finally, Pickens's account of events demonstrates, at most, CO Lieber left

27

Pickens unattended in his restrictive housing cell for 20 minutes after Pickens first claimed suicidality. (*See* Doc. 1 at 5). According to Pickens's account, 20 minutes passed between the first pepper spraying incident and the second. (*See* Doc. 1 at 5). Following the second pepper spraying incident, Pickens did not have the opportunity to engage in self-harm as he remained either in the presence of correctional staff, medical staff, or mental health staff: CO Neve and Sergeant Moore placed Pickens in restraints and escorted Pickens to the medical unit for decontamination roughly five minutes after the second pepper spraying incident. (Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5; Doc. 33-4 (Neve Aff.) at 1; Doc. 33-8 at 1; *see also* Doc. 1 at 5). An LPN completed a Body Chart shortly thereafter, (doc. 33-8 at 4), and issued an emergent mental health referral on behalf of Pickens, (doc. 33-12 at 58). Mental health staff placed Pickens on Constant Observation. (Doc. 33-12 at 29-30). Dr. Dutton ultimately released Pickens from Constant Observation later that morning as Pickens "[did] not meet crisis cell admission criteria." (Doc. 33-12 at 52; *see also* Doc. 33-12 at 30, 50, 55-57).

Pickens failed to make a *prima facie* showing of an essential element of his claim against CO Lieber for deliberate indifference to his serious mental health needs in violation of the Eighth Amendment. As such, CO Lieber stands entitled to judgment as a matter of law, and the court should grant his motion for summary judgment as to this claim. *Celotex Corp.*, 477 U.S. at 322-23.

### C.   Eighth Amendment Deliberate Indifference to Pickens's Serious Medical Needs

Pickens asserts an Eighth Amendment claim for deliberate indifference to his serious medical needs against CO McMahan and CO Roggensack based on the February 20, 2021, Incident.  (*See* Doc. 1 at 5).

"The Eighth Amendment forbids the 'inflict[ion]' of 'cruel and unusual punishments.'"  *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting U.S. Const. amend. VIII).  "And the Supreme Court has held that because the Cruel and Unusual Punishments Clause prohibits 'the unnecessary and wanton infliction of pain,' it also prohibits 'deliberate indifference to serious medical needs of prisoners.'"  *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). "'Federal and state governments therefore have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration.'"  *Id.* (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991)).

"'To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry.'"  *Hoffer*, 973 F.3d at 1270 (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). "To meet the first prong, the plaintiff must demonstrate an 'objectively serious medical need' - i.e., 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' and, in either instance, 'one that, if left unattended, poses a

substantial risk of serious harm.'" *Id.* (quoting *Farrow*, 320 F.3d at 1243).

"To satisfy the second, subjective prong, the plaintiff must prove that the prison officials 'acted with deliberate indifference to his serious medical need.'" *Id.* (alteration adopted) (quoting *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010)).[59] "'To establish deliberate indifference,'" a plaintiff must demonstrate prison officials "'(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence.'" *Id.* (quoting *Harper*, 592 F.3d at 1234). "An inmate-plaintiff bears the burden to establish both prongs." *Id.* (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)).

"'[D]eliberate indifference is not a constitutionalized version of common-law negligence.'" *Hoffer*, 973 F.3d at 1271 (quoting *Swain v. Junior*, 961 F.3d 1276, 1287-88 (11th Cir. 2020)). "'To the contrary, [the Eleventh Circuit] ha[s] been at pains to emphasize that "the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence," and is in fact akin to

---

[59] At all times relevant to this action, the State held Pickens as a convicted prisoner at Limestone Correctional Facility. (*See* Doc. 1 at 3). The Fourteenth Amendment's due process clause governs the treatment of arrestees or pretrial detainees in custody while the Eighth Amendment's prohibition on cruel and unusual punishment governs the treatment of convicted prisoners. *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1572 (11th Cir. 1985) (citations omitted). However, the minimum standard of medical care required by the due process clause and the clause prohibiting cruel and unusual punishment stands the same; therefore, the same standard applies to medical care provided to pretrial detainees and convicted prisoners. *Id.* at 1574 (holding "that in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons"). As such, caselaw interpreting the Fourteenth Amendment applies to Pickens's claims. *See id.*

"subjective recklessness as used in the criminal law."'" *Id.* (quoting *Swain*, 961 F.3d at 1287-88 (quoting in turn, respectively *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013), and *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994))). "With respect to prisoners' medical care, in particular, [the Eleventh Circuit] ha[s] held that the Eighth Amendment doesn't require it to be 'perfect, the best obtainable, or even very good.'" *Id.* (quoting *Harris*, 941 F.2d at 1510). "Rather, [the Eleventh Circuit] ha[s] emphasized, 'medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* (alterations adopted) (quoting *Harris*, 941 F.2d at 1510).

Prison officials can avoid Eighth Amendment liability by showing: (1) "they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844-45.

Pickens's claims against CO McMahan and Roggensack turn on whether Pickens suffered from a serious medical need on the morning of February 20, 2021. *Hoffer*, 973 F.3d at 1270 (quoting *Farrow*, 320 F.3d at 1243). A medical need "'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,'…[and] that, if left unattended, poses a substantial risk of serious harm,'" constitutes an objectively

31

serious medical need. *Hoffer*, 973 F.3d at 1270 (quoting *Farrow*, 320 F.3d at 1243).

The record before the undersigned does not establish Pickens exhibited a medical need so obvious that even a lay person would recognize Pickens needed treatment. As such, Pickens failed to demonstrate he had a serious medical need on February 20, 2021.

Roughly six hours after Pickens told CO McMahan he needed medical attention and roughly two hours after Pickens told CO Roggensack the same, an RN interacted with Pickens and noted no signs or symptoms of distress.[60] (*See* Doc. 1 at 5; Doc. 33-11 at 69). The record does not indicate the RN sought medical treatment for Pickens at that time. (*See* Doc. 33-11 at 69; *see generally* Doc. 33-11; Doc. 33-12). If the RN did not believe Pickens suffered from a serious medical need, and Pickens did not seek medical attention from the RN, mere hours after he complained to CO McMahan and CO Roggensack of needing medical attention, it reasonably follows Pickens's need for medical attention would not be so obvious that CO McMahan and CO Roggensack, both non-medical personnel, should have recognized Pickens needed immediate medical attention. *See Hoffer*, 973 F.3d at 1270 (defining a serious medical need as "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" (internal quotation marks and citations omitted).

Moreover, records indicate the stab wound Pickens complained of and exhibited

---

[60] Pickens did not name this RN as a defendant in this case. (*See* Doc. 1 at 1).

to CO McMahan did not evince a recent injury.  Six days after the incident, on February 26, 2021, Pickens complained to an RN of spasms in his back/chest "where stab wounds were."  (Doc. 33-11 at 58).  The RN indicated Pickens did not exhibit any signs or symptoms "of acute distress."  (Doc. 33-11 at 58).  There exists no indication the RN sought medical treatment for Pickens at that time.  (*See* Doc. 33-11 at 58; *see generally* Doc. 33-11; Doc. 33-12).  Roughly two hours later, Pickens met with a mental health professional and did not complain of pain in his back/chest at that time.  (*See* Doc. 33-12 at 14).  In addition, photographs taken 13 days after the February 20, 2021, incident, following an alleged excessive force incident on March 5, 2021, do not show evidence of a recent stab wound to Pickens's chest or back (albeit, the photographs do not depict Pickens's entire back and chest).  (*See* Doc. 33-10 at 9, 15).

Pickens failed to make a *prima facie* showing of an essential element of his claims against CO McMahan and CO Roggensack for deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  As such, CO McMahan and CO Roggensack stand entitled to judgment as a matter of law, and the court should grant their motion for summary judgment as to this claim.  *Celotex Corp.*, 477 U.S. at 322-23.

### D.    Eighth Amendment Excessive Force Claims

The Eighth Amendment governs convicted prisoner's claims for excessive force by prison officials.  *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986) *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010)) ("The Eighth Amendment's proscription of cruel and unusual

punishments…governs prison officials' use of force against convicted inmates.").

As relayed, the "Eighth Amendment, among other things, prohibits 'cruel and unusual punishments.'" *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (citing U.S. Const. amend. VIII). Pursuant to Supreme Court authority, "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In assessing an inmate's excessive force claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6 (citing *Whitley*, 475 U.S. at 320-21). "[A] correctional officer's malicious and sadistic actions that both have no legitimate penological purpose and are unacceptable by contemporary standards of decency subject a prisoner to cruel and unusual punishment, in violation of the Eighth Amendment." *Sconierst*, 946 F.3d at 1265 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)).

The excessive force standard encompasses both subjective and objective inquiries. Subjectively, the court must assess whether "'the excessive force . . . was sadistically and maliciously applied for the very purpose of causing harm.'" *Sconiers*, 946 F.3d at 1265 (citations omitted). Objectively, the court must assess "whether the official's actions were 'harmful enough.'" *Id.* (citations omitted). "[T]he official must have both 'acted with a sufficiently culpable state of mind' (the subjective element), and the conduct must have been 'objectively harmful enough to establish a constitutional violation.'" *Id.* (quoting *Hudson*, 503 U.S. at 8).

34

As the Eleventh Circuit recently articulated, the Supreme Court's *Wilkins* decision "clarified that courts cannot find excessive force claims not 'actionable' because the prisoner did not suffer 'more than de minimis injury.'" *Id.* at 1267. Unquestionably, not "every malevolent touch by a prison guard gives rise to a federal cause of action," as an "inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 37, 38 (quoting *Hudson*, 503 U.S. at 8). Nevertheless, "the Eighth Amendment prohibits force that offends 'contemporary standards of decency,' regardless of whether 'significant injury is evident,' though the extent of injury may shed light on the amount of force applied or 'whether the use of force could plausibly have been thought necessary.'" *Id.* at 1266 (quoting *Wilkins*, 559 U.S. at 37). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.*

With these principles in mind, the Supreme Court set out certain factors courts should consider when evaluating whether force deployed by corrections officials exceeded constitutional boundaries. These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate.

*Whitley*, 475 U.S. at 321; see also *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999) (citing *Whitley*, 475 U.S. at 321; *Hudson*, 503 U.S. at 7) (same).

### 1.   February 15, 2021, Incident

#### a.   CO Lieber

The standard that governs excessive force claims, as laid out above, probes "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. 1, 6-7. "[A] correctional officer's malicious and sadistic actions that both have no legitimate penological purpose and are unacceptable by contemporary standards of decency subject a prisoner to cruel and unusual punishment, in violation of the Eighth Amendment." *Sconiers*, 946 F.3d at 1265 (citing *Wilkin*, 559 U.S. at 37). As such, CO Lieber violated the Eighth Amendment if he pepper-sprayed Pickens without a penological justification. *See Sconiers*, 946 F.3d at 1267-68 ("Pepper-spraying and slamming a person to the ground without penological justification certainly offends common standards of decency.").

Pickens's version of events establishes CO Lieber twice pepper-sprayed Pickens with no penological justification on February 15, 2021. (*See* Doc. 1 at 5). Pickens, housed in a restrictive housing cell, posed no physical threat to CO Lieber or anyone else. (*See* Doc. 1 at 5; Doc. 33-8 at 1). Moreover, the record, viewed in the light most favorable to Pickens, does not establish Pickens failed to obey a direct order from CO Lieber prior to being pepper-sprayed.

To recap: On February 15, 2021, while Pickens was housed in a restrictive

36

housing cell at Limestone, CO Lieber pepper sprayed Pickens through his cell food door after Pickens claimed suicidality.  (Doc. 1 at 5).  Twenty minutes later, Pickens again kicked his door.  (Doc. 1 at 5).  When CO Lieber arrived at Pickens's cell, he opened the tray door to Pickens's cell to speak with Pickens.  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶¶ 5; Doc. 33-8 at 1).   Pickens requested a body chart, asked to speak to a supervisor, and again expressed suicidality to CO Lieber.  (Doc. 1 at 5).  CO Lieber pepper-sprayed Pickens a second time.  (Doc. 1 at 5; Doc. 33-8 at 1).

As to the first incident, CO Lieber contends it did not occur and so proffers no additional factual allegations.  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5; *see also* Doc. 33-8 at 1).   Moreover, Pickens's version of the event does not establish he failed to obey CO Lieber's direct order.  (*See* Doc. 1 at 5).  As such, if CO Lieber pepper-sprayed Pickens this first occasion, CO Lieber violated the Eighth Amendment by using excessive force on Pickens without a penological justification.  *See Sconiers*, 946 F.3d at 1267-68.

As to the second incident, Pickens contends he did not prevent CO Lieber from closing his tray door.  (Doc. 38 at 3 ¶ 3).  Therefore, at the summary judgment stage, CO Lieber's directive for Pickens to remove his arm from the tray door so that CO Lieber could close it does not provide a penological justification for CO Lieber to pepper-spray Pickens.  *See Sconiers*, 946 F.3d at 1267-68 (punishing an inmate for questioning an officer's order would not have a legitimate penological purpose if the officer gave the order "for nothing more than [his] own enjoyment," or to "toy[ ] with [the inmate] like a yo-yo").

Viewing the record in the light most favorable to Pickens, he made a *prima facie* showing that CO Lieber twice used excessive force against him in violation of the Eighth Amendment on February 15, 2021.  As such, CO Lieber does not stand entitled to judgment as a matter of law, and the court should deny his motion for summary judgment as to this claim.

### b.    CO Neve

Pickens's version of events establishes CO Neve deployed excessive force on Pickens without penological justification.  (*See* Doc. 1 at 5).  Following CO Lieber's pepper-spraying of Pickens, CO Neve and Sergeant Moore placed Pickens in restraints and escorted Pickens to the medical unit for decontamination.  (Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5; Doc. 33-4 (Neve Declr.) at 1; Doc. 33-8 at 1; *see also* Doc. 1 at 5).  While taking Pickens outside, CO Neve grabbed Pickens by the back of the neck and rammed Pickens's head into a wall twice.  (Doc. 1 at 5).  CO Neve contends the incident did not occur and so proffers no additional factual allegations.  (*See* Doc. 33-4 (Neve Aff.) at 1; *see also* Doc. 33-8 at 1).  Moreover, Pickens's version of events does not establish Pickens posed a threat to safety or security or that Pickens failed to obey a direct order.  (*See* Doc. 1 at 5; Doc. 38).  As such, if CO Neve grabbed Pickens by the back of the neck and rammed his head into a wall twice without a penological justification, CO Lieber violated the Eighth Amendment by employing excessive force.  *See Sconiers*, 946 F.3d at 1267-68.

Viewing the record in the light most favorable to Pickens, Pickens made a *prima*

*facie* showing that CO Neve used excessive force against him in violation of the Eighth Amendment on February 15, 2021.   As such, CO Neve does not stand entitled to judgment as a matter of law, and the court should deny his motion for summary judgment as to this claim.

### 2.    February 20, 2021, Incident

Pickens's version of events establishes CO McMahan, CO Roggensack, and CO Weller deployed excessive force on Pickens maliciously and sadistically to cause harm on February 20, 2021.   (*See* Doc. 1 at 5-6).   To recount, shortly after CO McMahan refused to take Pickens to obtain medical attention, Pickens started a fire in his cell to attract a supervisor's attention.   (Doc. 1 at 5).   CO McMahan, CO Roggensack, and CO Weller responded to the fire.   (Doc. 1 at 5-6).   Although Pickens informed CO McMahan, CO Roggensack, and CO Weller he had already extinguished the fire, they sprayed Pickens in the face with the water hose, and CO McMahan chased Pickens around the cell continuing to spray him.   (Doc. 1 at 6).

Certainly, a penological justification exists for responding to the fire in Pickens's cell.  *See Burke v. Browns*, 653 F. App'x 683, 697-98 (11th Cir. 2016) (unpublished)[61] (per curiam) ("The need to extinguish a fire in a prison is unquestionably great as a matter of prisoner safety, officer safety, and public safety.").   However, the correctional

---

[61] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. Rule 36-2.

officers proffer no penological justification for intentionally spraying Pickens in the face

with the water hose and continuing to spray Pickens with the water hose unnecessarily

once the fire was extinguished.[62]  Given the totality of the circumstances, a reasonable

juror could conclude CO McMahan, CO Roggensack, and CO Weller purposefully

performed the afore-mentioned actions with the malicious and sadistic intent to cause

harm.  *See Chatman v. Roy*, No. 2:17-cv-01952-AKK-SGC, 2019 WL 4621676, at *5

(N.D. Ala. Aug. 28, 2019) *report and recommendation adopted by* 2019 WL 4599929 (N.D.

Ala. Sep. 23, 2019) (denying summary judgment where plaintiff alleged correctional

officer sprayed plaintiff in the face with a fire extinguisher and the correctional officer

failed to provide any explanation (citing *Hudson*, 503 U.S. at 6-7 (holding that excessive

force claim requires consideration of "whether force was applied in a good-faith effort

to maintain or restore discipline, or maliciously and sadistically to cause harm")).

Viewing the record in the light most favorable to Pickens, he made a *prima facie*

showing that CO McMahan, CO Roggensack, and CO Weller used excessive force in

violation of the Eighth Amendment on February 20, 2021.  As such, they do not stand

entitled to judgment as a matter of law, and the court should deny their motion for

summary judgment as to this claim.

---

[62] CO Weller does not recall Pickens or the events of February 20, 2021.  (Doc. 36-1 (Weller Aff.) at 1 ¶¶ 4-5).   COs McMahan and Roggensack contend the events of February 20, 2021, could not have occurred.  (*See* Doc. 33-3 (McMahan Aff.) at 1; Doc. 33-5 (Roggensack Aff.) at 1).  As such, they proffer no additional factual allegations.

### 3.      March 5, 2021, Incident

### a.     CO Andrews

Pickens's version of events establishes CO Andrews pepper-sprayed Pickens with no penological justification on March 5, 2021. (*See* Doc. 1 at 5). Pickens, housed in a restrictive housing cell, posed no physical threat to CO Andrews or anyone else. (*See* Doc. 1 at 5; Doc. 33-10 at 1). Moreover, the record, viewed in the light most favorable to Pickens, does not establish Pickens failed to obey a direct order from CO Andrews prior to being pepper-sprayed.

To recap, on March 5, 2021, CO Andrews and CO Neve went to Pickens's cell door and threatened to spray Pickens if he kicked on his door. (Doc. 1 at 6). Later that day, CO Andrews and CO Neve started the showers on the wrong end of the dorm, and several inmates began kicking their cell doors in protest. (Doc. 1 at 6). Although Pickens did not kick his cell door, CO Andrews opened Pickens's food trap and pepper sprayed him. (Doc. 1 at 6; *see also* Doc. 33-10 at 1).

Pickens contends he did not kick his cell door. (Doc. 1 at 6). Therefore, at the summary judgment stage, CO Andrews's directive for Pickens to cease kicking his cell door does not provide a penological justification for CO Lieber to pepper spray Pickens. *See Sconiers*, 946 F.3d at 1267-68 (punishing an inmate for questioning an officer's order would not have a legitimate penological purpose if the officer gave the order "for nothing more than [his] own enjoyment," or to "toy[ ] with [the inmate] like a yo-yo").

Viewing the record in the light most favorable to Pickens, he made a *prima facie* showing that CO Andrews employed excessive force against him in violation of the Eighth Amendment on March 5, 2021.  As such, CO Andrews does not stand entitled to judgment as a matter of law, and the court should deny his motion for summary judgment as to this claim.

### b.    CO Neve

As a reminder, the factors courts should consider when evaluating whether force administered by corrections officers exceeded constitutional boundaries include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate.  *Whitley*, 475 U.S. at 321; see also *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999) (citing *Whitley*, 475 U.S. at 321; *Hudson*, 503 U.S. at 7) (same).

As regards this incident, while Pickens was handcuffed he pulled away from CO Neve and attempted to reach CO Andrews.[63]  (Doc. 33-4 (Neve Aff.) at 1; Doc. 33-10 at 1).  CO Neve pepper-sprayed Pickens, made Pickens drop to his knees, kicked Pickens in the back, and made Pickens put his face in the dirt.[64]  (Doc. 1 at 6; *see also*

---

[63] Pickens does not dispute he pulled away from CO Neve and attempted to reach CO Andrews.  (*See* Doc. 1 at 6; *see generally* Doc. 38).

[64] CO Neve admits he took Pickens to the ground to gain compliance but does not admit that he pepper-sprayed Pickens at this time.  (Doc. 33-4 (Neve Declr.) at 1).

Doc. 33-8 at 1).  CO Neve then told Pickens he "better stop" complaining about him because "no one care[d]." (Doc. 1 at 6).

While sitting on a bench in the Infirmary still handcuffed, Pickens proceeded to spit pepper spray out of his mouth and blow it out of his nose.  (Doc. 1 at 6-7).  Pickens's discharge hit CO Neve, who had entered the Infirmary to decontaminate himself, in the abdomen; Pickens spit again and hit CO Neve in the face.  (Doc. 33-4 (Neve Aff.) at 1).  CO Neve clotheslined Pickens off the bench and choked Pickens from behind until he blacked out.  (Doc. 1 at 7).  Correctional officers had to pull CO Neve off Pickens.  (Doc. 1 at 7).

Pickens refused a body chart and remarked, "I don't need medical," following the incident.  (Doc. 33-10 at 5).  The photographs taken on March 5, 2021, show dirt on Pickens's shirt, (doc. 33-10 at 6), and apparently minor abrasions to Pickens's face, (doc. 33-10 at 10, 16-17).  Pickens does not allege any injuries, serious or otherwise, in his complaint or his response to defendants' motion.  (*See* Doc. 1 at 7; *see generally* Doc. 38).

Taking Pickens's account as true, CO Neve did not use excessive force against Pickens as to the initial takedown.  That incident required the need for application of force to protect another correctional officer.[65]   CO Neve did not use more force than

---

[65] CO Neve's reference to Pickens's complaints against him do not alter this finding.  As the Eleventh Circuit explained in *Burke v. Brown*:

necessary to maintain order as to the takedown.  Pepper spraying a prisoner and kicking him to the ground to prevent an assault on another correctional officer exhibits a reasonable amount of force given the situation.  Furthermore, Pickens suffered only minor injuries due to the incident, which constitutes a factor for consideration notwithstanding the abrogation of the de minimis proviso.  *See Burke*, 653 F. App'x  at 697-98 (affirming summary judgment in a *Bivens v. Six Unk. Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971) case after finding correctional officer – who, upon believing plaintiff spat upon him, slammed "fully restrained and defenseless" plaintiff face first into the floor, placed plaintiff into an "arm bar" hold, and chastised plaintiff for having filed an administrative complaint against the correctional officer for an earlier incident -- "did not run afoul of the Eighth Amendment" where correctional officer possessed a penological justification to use force and plaintiff sustained only minor injuries).[66]

---

We acknowledge that [the correctional officer's] contemporaneous statement concerning Plaintiff's prior administrative complaint is probative of a potentially improper motive, but that motive does not negate the propriety of using a limited amount of force to restrain an inmate believed to have spit on an officer. *C.f. O'Bryant v. Finch*, 637 F.3d 1207, 1220 (11th Cir. 2011) ("Stated another way, even if some impermissible reason had entered into [the officers'] decision-making process ..., [the prisoner] would have been disciplined anyway....").

653 F. App'x 683, 698 n.15 (11th Cir. 2016) (unpublished) (per curiam).

[66] [S]uits under § 1983 and *Bivens* are very similar. A § 1983 suit challenges the constitutionality of the actions of state officials; a *Bivens* suit challenges the constitutionality of the actions of federal officials. The effect of *Bivens* was, in essence, to create a remedy against federal officers, acting under color of federal law, that was analogous to the section 1983 action against state officials. Thus, courts generally apply § 1983 law to *Bivens* cases.

As to the second incident, Pickens accidentally (according to Pickens) spat upon CO Neve twice.   To address the conduct, Neve clotheslined Pickens and employed a chokehold until Pickens blacked out.  A chokehold amounts to the risk of deadly force, and therefore it constitutes disproportionate force if an officer uses it in unwarranted circumstances. *See Pullen v. Osceola Cnty.*, 861 F. App'x 284, 289 (11th Cir. 2021) ("'Once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth Amendment, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation.' In particular, 'when jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive.'") (cleaned up) (quoting *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991); *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010))); *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) (holding that jail official's use of chokehold and other force to subdue non-resisting pretrial detainee during jail disturbance, rendering detainee temporarily unconscious, then striking detainee while detainee was handcuffed, kneeling, and non-resisting, was malicious and sadistic use of force); *McQurter v. City of*

---

*Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir. 1995) (per curiam) (internal quotation marks and citations omitted).

*Atlanta, Ga.*, 572 F. Supp. 1401, 1414 (N.D. Ga. 1983) (holding that force used by police officers in effectuating arrest, causing severe injuries leading to death, was malicious and sadistic where officer continued to apply choke hold after arrestee had been cuffed and officer could not have reasonably believed that deadly force was necessary to prevent death or serious bodily injury to himself, another police officer, or to a third party); *Cf. Williams v. Kelley,* 624 F.2d 695 (application of chokehold to prisoner, which apparently caused his death, was not constitutionally tortious where chokehold was used by jailors to protect their own safety and in a good faith effort to maintain or restore discipline); *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 540-41 (6th Cir. 2015) (holding that use of a chokehold on an unresisting detainee who was  in handcuffs, a belly chain, and leg irons, constitutes excessive force in violation of the Fourteenth Amendment when it rendered the detainee unconscious and caused his death); *Marshall v. West*, 559 F. Supp. 2d 1224, 1243-44 (M.D. Ala. 2008), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that officer's alleged use of chokehold constituted excessive force in violation of motorist's Fourth Amendment rights where chokehold occurred after motorist's arrest while motorist's hands were cuffed behind his back and officer did not believe that motorist posed a flight risk or a threat to his safety); *but see J.B. ex rel. Brown v. Amerson*, 519 F. App'x 613, 619-20 (11th Cir. 2013) (unpublished) (per curiam) (affirming summary judgment on qualified immunity grounds after finding no violation of the Fourth Amendment in that Sherriff's application of a 19-20 second chokehold "was not disproportionate to the perceived

46

need for force" due to plaintiff's "undisputed lack of respect for the jail officers, his threats to them, and his demonstrated willingness to lash out at . . . them" and where Sheriff reasonably believed plaintiff intended to spit on him).

In the circumstances at bar as to CO Neve's use of a chokehold, Pickens was constrained during the entirety of the incident; there exist no allegations Pickens continued to spit once in the chokehold; Pickens could not have spit on CO Neve once in the chokehold given their relative positions; and there exist no allegations Pickens struggled once taken down. In these circumstances, there ensues a disputable issue of fact whether Neve engaged in malicious and sadistic conduct if he continued to employ the chokehold beyond its necessity, particularly to the point where Pickens blacked out. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." (citation omitted)).

Viewing the record in the light most favorable to Pickens, he failed to make a *prima facie* showing that CO Neve used excessive force against him in violation of the Eighth Amendment on March 5, 2021, as to the initial takedown on the way to the infirmary, but there exists a genuine dispute of material fact whether he did so as to the use of the chokehold on Pickens. As such, CO Neve stands entitled to judgment as a matter of law in part, and the court should grant his motion for summary judgment accordingly. *Celotex Corp.*, 477 U.S. at 322-23.

### 4.    March 27, 2021, Incident

While on the way back to their cell after showering, Pickens and his roommate

47

saw Lt. Howell in the cube.  (Doc. 1 at 7).  When Pickens asked Lt. Howell if they could speak, CO Neve grabbed Pickens by the arm and forced Pickens to walk up the stairs to his cell.  (Doc. 1 at 7).  When they arrived at Pickens's cell, CO Neve removed Pickens's handcuffs through the food trap and then pushed Pickens forward on his buttocks.  (Doc. 1 at 7).

The undersigned concludes CO Neve's grabbing of Pickens's arm and pushing on Pickens's buttocks did not constitute excessive force in violation of the Eighth Amendment.  Pickens's alleged perpetration of force amounts to "a 'push or shove' that causes no discernible injury," and thus "almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38 (citation omitted). That is, Pickens has not established CO Neve's conduct was "objectively harmful enough to establish a constitutional violation."  *Sconiers*, 946 F.3d at 1265 (citation omitted); *see also Hudson*, 503 U.S. at 9 ("The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not a sort repugnant to the conscience of mankind.") (internal quotation marks and citations omitted)).

Pickens failed to make a *prima facie* showing that CO Neve used excessive force against him in violation of the Eighth Amendment on March 27, 2021, in this regard. As such, CO Neve stands entitled to judgment as a matter of law, and the court should grant his motion for summary judgment as to this claim.  *Celotex Corp.*, 477 U.S. at 322-23.

E.     **Eighth Amendment Conditions of Confinement**

1.     **Constitutional Violation**

The Eighth Amendment prohibits conditions of confinement that amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U.S. 337, 345-47 (1981).  To establish a conditions-of-confinement claim under the Eighth Amendment, a plaintiff must prove three elements: "(1) a condition of confinement that inflicted unnecessary pain or suffering" (*i.e.*, was cruel and unusual), "(2) the defendants' 'deliberate indifference' to that condition, and (3) causation." *LaMarca*, 995 F.2d at 1535 (citations omitted); *see also Thomas v. Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010) (A conditions-of-confinement claim "requires a two-prong showing: an objective showing of a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities' and a subjective showing that the official had a 'sufficiently culpable state of mind.'" (quoting *Farmer*, 511 U.S. at 834); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1572 (11th Cir. 1985) (explaining an Eighth Amendment violation may occur when a state fails "to provide prisoners with reasonably adequate food, clothing, shelter, and sanitation").

Whether an injury or deprivation stands sufficiently serious to satisfy the objective prong constitutes "a question of law [courts] evaluate based on 'evolving standards of decency,'" and "[courts] balance these standards of decency against prison officials' need to keep the prison safe." *Thomas*, 614 F.3d at 1307 (quoting *Rhodes*, 452 U.S. at 346) (other citation omitted).  "Conditions must not involve the wanton and

unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 347.  Unnecessary and wanton inflictions of pain include "those that are 'totally without penological justification.'" *Id.* at 346 (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion); *Estelle*, 429 U.S. at 103).  In addition, prison conditions amount to cruel and unusual punishment when they result in "unquestioned and serious deprivation of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" such as "essential food, medical care, or sanitation." *Id.* at 347-48.

Finally, "[t]he challenged condition must be extreme," which requires plaintiff to demonstrate "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal quotation marks and citations omitted) (emphasis in original).  Moreover, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Rhodes*, 452 U.S. at 347.  "While an inmate 'need not await a tragic event' before seeking relief," she must establish "a condition of his confinement 'pose[s] an unreasonable risk of serious damage to his future health' or safety."  *Chandler*, 379 F.3d at 1289 (alteration in original) (quoting *Helling*, 509 U.S. at 33, 35).

Regarding the subjective inquiry in conditions-of-confinement cases, "the relevant state of mind for purposes of liability is deliberate indifference." *Thomas*, 614 F.3d at 1303-04 (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).  "'[D]eliberate

indifference is not a constitutionalized version of common-law negligence.'" *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (quoting *Swain*, 961 F.3d at 1287-88). "'To the contrary, [the Eleventh Circuit] ha[s] been at pains to emphasize that "the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence," and stands in fact akin to "subjective recklessness as used in the criminal law."'" *Id.* (quoting *Swain*, 961 F.3d at 1287-88 (quoting in turn, respectively *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013), and *Farmer*, 511 at 839-40)).  Thus, to prove deliberate indifference, a plaintiff must demonstrate defendants subjectively knew of a risk of serious harm to plaintiff. *Hoffer*, 973 F.3d at 1270; *see also LaMarca*, 995 F.2d at 1535 (To establish deliberate indifference, "a plaintiff must prove that the official possessed the knowledge both of the infirm condition and of the means to cure that condition, 'so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" *Id.* at 1535 (quoting *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985), *cert. denied*, 479 U.S. 816 (1986)); *Thomas*, 614 F.3d 1312 ("[T]he evidence must demonstrate that with knowledge of the infirm conditions, the official knowingly or recklessly declined to take actions that would have improved the conditions." (alteration and quotation omitted)).

> Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Caldwell v. Warden, FCI Talladega*, 748 F. 3d 1090, 1100 (11th Cir. 2014). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate

indifference.  Each individual defendant must be judged separately and on the basis of what that person kn[ew]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citation omitted).

*Dang by and through Dang*, 871 F.3d at 1280.

Moreover, "[a]s with any other claim brought under § 1983, to succeed, the inmate must demonstrate a causal connection between the prison official's conduct and the Eighth Amendment violation." *Rodriguez*, 508 F.3d at 617 (citing *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982); *LaMarca*, 995 F.2d at 1526).  Section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca*, 995 F.2d at 1538 (internal quotation marks and citations omitted).  That is, the constitutional deprivation must constitute "a legal cause of [the plaintiff's] injuries" and not merely pose a contributing factor. *Williams*, 689 F.2d at 1381; *LaMarca*, 995 F.2d at 1538.  "A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 706 (11th Cir.1985)).

And again, prison officials can avoid Eighth Amendment liability by showing: (1) "they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger[;]" (2) "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent[;]" or (3) "they responded reasonably to the risk, even if the harm

ultimately was not averted." *Farmer*, 511 U.S. at 844-45 (citations omitted).

Certain "conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (citations omitted).

Moreover, "the Eighth Amendment is concerned with both the 'severity' and the 'duration' of the prisoner's exposure to inadequate [shelter]." *Chandler*, 379 F.3d at 1295. "Severity and duration do not necessarily form a perfect sliding scale, but [the court's] analysis should be informed by a consideration of both factors." *Id.* (quoting *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) ("[I]t is not just the severity of the cold, but the duration of the condition, which determines whether the conditions of confinement are unconstitutional.")).

To recount, after CO McMahan, CO Roggensack, and CO Weller used a water hose to extinguish a fire in Pickens's cell, they left Pickens, still soaking wet, in an outdoor walk cage in weather cold enough for snow to be on the ground for about an hour. (Doc. 1 at 6). Undoubtedly pursuant to Pickens's alleged facts, the officers possessed subjective knowledge of Pickens's condition, and they acted with more than

gross negligence.[67]   As such, Pickens's claim turns on whether the condition stood extreme enough to violate the Eighth Amendment, and whether Pickens faced a substantial risk of serious harm due to the condition.

The undersigned concludes the facts in this regard, if true, portray CO McMahan, CO Roggensack, and CO Weller subjected Pickens to a condition extreme enough to violate the Eighth Amendment.  The combination of exposure to freezing temperatures outdoors for an hour, while soaking wet, mutually effected a deprivation of Pickens's constitutional right against cruel and unusual punishment.  *Wilson*, 501 U.S.  at 304; *see also Chandler*, 379 F.3d at 1290 n.22 (collecting cases "brought by prisoners subjected to extreme cold, either alone or in combination with other prison conditions"); *Del Raine v. Williford*, 32 F.3d 1024, 1035-36 (7th Cir. 1994) (reversing the district court's grant of summary judgment for federal prison officials where the prisoner alleged repeated strip searches lasting for 15 to 30 minutes and broken windows in the prison provided no relief from bitter cold weather, including one occasion where the outdoor wind chill stood forty to fifty degrees below zero); *Cf. Dixon v. Godinez,* 114 F.3d 640 (7th Cir. 1997) (prison officials were unentitled to summary judgment when they submitted no evidence rebutting the inmate's allegation that ice formed regularly on his cell walls); *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir. 1988) (reversing summary judgment in favor

---

[67] While CO Roggensack and CO Weller may not have had specific knowledge Pickens remained outside for about an hour, there ensues a reasonable inference they knew he was outside and did not ensure he came back inside for about an hour.  As such, they stand in the same position as CO Weller, who remained outside with Pickens.

of prison officials where the inmate alleged that, for three months, he was exposed temperatures so cold that ice formed in the toilet bowl of his cell). *But see Bennett v. Chitwood*, 519 F. App'x 569, 574 (11th Cir. 2013) (unpublished) (per curiam) ("Given the limited duration of [plaintiff's] exposure to cool temperatures and the modest severity of those temperatures (even accepting [plaintiff's] estimate that the temperature was in the 50s), the conditions were not so extreme to reach the level of an Eighth Amendment violation." (internal quotation marks omitted)).[68]

The undersigned also concludes Pickens faced a substantial risk of serious harm, not only to his physical wellbeing, but also to his mental health as evidenced by his placement on Constant Observation immediately following the incident and his subsequent placement on NASW the following morning where he remained until February 27, 2021, seven days after the incident. *See Del Raine*, 32 F.3d at 1035 ("To only find an Eighth Amendment violation from inadequate housing when the inmate's health is endangered suggests that frostbite, hypothermia, or a similar infliction is an absolute requisite to the inmate's challenge. Not so.").[69]

---

[68] Pursuant to available data, the temperatures on the morning in question hovered in the 30s, and it had snowed two days prior. https://www.timeanddate.com/weather/@4830668/historic?month=2&year=2021 (last accessed July 31, 2023).

[69] Cold-related illnesses include hypothermia, frostbite, trench foot, and chilblains. https://www.cdc.gov/niosh/topics/coldstress/coldrelatedillnesses.html (last accessed July 30, 2023). "Hypothermia is a medical emergency that occurs when your body loses heat faster than it can produce heat, causing a dangerously low body temperature." https://www.mayoclinic.org/diseases-conditions/hypothermia/symptoms-causes/syc-20352682#:~:text=When%20your%20body%20temperature%20drops,or%20immersion%20in%20

As to Pickens's claims he urinated on himself after CO Weller refused to enable him to use the bathroom for about an hour, Pickens failed to create a genuine issue of fact his condition stands extreme enough to violate the Eighth Amendment.  Pickens occupied the walk cage for approximately an hour, which does not constitute an unreasonable amount of time regarding the aggrieved circumstances.  *See Carter v. DeKalb Cnty., Ga.*, 521 F. App'x 725, 730 (11th Cir. 2013) (unpublished) (per curiam) (concluding arrestee's allegations officers refused to take him to the restroom, he urinated on himself, and was then forced to sit in his wet underpants over a three-hour period failed to allege "any 'extreme' conditions that pose 'an unreasonable risk of serious damage to his future health'" (quoting *Chandler*, 379 F.3d at 1289-90).

Viewing the record in the light most favorable to Pickens, he made a *prima facie* showing CO McMahan, CO Roggensack, and CO Weller violated his Eighth Amendment right against extreme conditions as to the February 20, 2021, exposure incident, but not the allegations regarding the opportunity to urinate.   However,

---

cold%20water (last accessed July 30, 2023).  "Left untreated, hypothermia can lead to complete failure of your heart and respiratory system and eventually to death."  *Id.*  Hypothermia "affects the brain, making the victim unable to think clearly or move well" making it "especially dangerous, because a person may not know that it's happening and won't be able to do anything about it." https://www.cdc.gov/disasters/winter/staysafe/hypothermia.html (last accessed July 30, 2023). "While hypothermia is most likely at very cold temperatures, it can occur even at cool temperatures (above 40°F) if a person becomes chilled from rain, sweat, or submersion in cold water."  *Id. See also* https://www.mayoclinic.org/diseases-conditions/hypothermia/symptoms-causes/syc-20352682#:~:text=When%20your%20body%20temperature%20drops,or%20immersion%20in%20 cold%20water (last accessed July 30, 2023) ("[H]eat loss from your body is much faster if your clothes are wet[.]").  "Someone with hypothermia usually isn't aware of his or her condition because the symptoms often begin gradually."   https://www.mayoclinic.org/diseases-conditions/hypothermia/symptoms-causes/syc-20352682 (last accessed July 30, 2023).

Pickens's claim in this regard does not withstand the qualified immunity defense.

## 2.   Qualified Immunity

The following discussion addresses only whether CO McMahan, CO Roggensack, and CO Weller stand entitled to qualified immunity on Pickens's complaint they subjected him to unconstitutional conditions of confinement on February 20, 2021, when they left a soaking wet Pickens outside in the freezing cold for approximately an hour.[70]

Qualified immunity protects governmental officials performing discretionary functions in their individual capacity from civil suit and liability "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

There exists no dispute CO McMahan, CO Roggensack, and CO Weller performed a discretionary function in these circumstances.  Furthermore, as analyzed

---

[70] As the analyses in the report portray, none of the other causes of action arguably demonstrate viable constitutional claims that survive dismissal, except for Eighth Amendment excessive force claims which are not susceptible to summary judgment:

> [A] defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force "maliciously and sadistically to cause harm" is clearly established to be a violation of the Constitution.... There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation. The only question, then, is whether the plaintiff has alleged facts sufficient to survive a ... motion for summary judgment. If he has done so, that is the end of the inquiry.

*Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citations omitted).

previously a reasonable jury may determine they violated Pickens's constitutional rights based upon Pickens's allegations regarding the exposure.  Therefore, whether applicable case law clearly established Pickens's constitutional rights stands the only remaining issue.  *See Hill*, 797 F.3d at 978.

A clearly established constitutional right arises from "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."  *Hill*, 797 F.3d at 979 (citation omitted). Under the second, afore-cited method, "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  *Id.* (citation omitted). Although the "clearly established right must be defined with specificity,"  *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam), "[t]he 'very action in question' does not have to have been previously held unlawful, but the unlawfulness of the conduct must be apparent in light of pre-existing law,"  *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In further exposition, a right stands clearly established if a defendant acted on "fair warning" that his conduct violated the constitutional rights of the plaintiff.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *United States v. Lanier*, 520 U.S. 259 (1997)).  As elaborated, "fair warning" may emanate either from factually similar case law or where

the right is one of 'obvious clarity' – i.e., where the officer's conduct "lies so obviously at the very core of what the [constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009); *see also Hope*, 536 U.S. at 745 ((holding that "[t]he obvious cruelty inherent" in putting prisoners in certain wantonly "degrading and dangerous" situations provides officers "with some notice that their alleged conduct violate[s]" the Eighth Amendment); *Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015) ("Forcing a prisoner to soil himself over a two-day period while chained in a hospital bed creates an obvious health risk and is an affront to human dignity.  Laughing at and ridiculing an inmate who is forced to sit in his own feces for an extended period of time is not merely unreasonable, but an act of 'obvious cruelty.'" (citing *Hope*, 536 U.S. at 745)).

Litigants may rely upon binding decisions of the Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state to ascertain clearly established rights. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *March v. Butler Cnty.*, 268 F.3d 1014, 1032 n. 10 (11th Cir. 2001) (en banc), *abrogated in part on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007)).

No case law from the United States Supreme Court, Eleventh Circuit, or Alabama Supreme Court provided CO McMahan, CO Roggensack, and CO Weller fair warning their actions and inactions on February 20, 2021, would violate Pickens's rights under the Eighth Amendment as all reported decisions stand distinguishable from the

facts in this case. *See Taylor v. Riojas*, 141 S. Ct. 52,  (2020) (per curiam) (finding sufficient allegations of an Eighth Amendment violation regarding a prisoner confined for six days in "shockingly unsanitary cells":  the first of which "was covered, nearly floor to ceiling, in massive amounts of feces: all over the floor, the ceiling, the window, the walls, and even packed inside the water faucet" causing the prisoner to not eat or drink for nearly four days; and the second was a "frigidly cold cell, which was equipped with only a clogged drain in the floor to dispose of bodily wastes," such that when the prisoner finally relieved himself after 24 hours he "caus[ed] the drain to overflow and raw sewage to spill across the floor" leaving him "to sleep naked in sewage" (internal quotation marks and citations omitted)); *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (reversing the district court's grant of summary judgment in favor of prison officials where - for 16 days - a prisoner was denied clothing except undershorts, confined to a cell with temperatures as low as 60 degrees, and required to sleep on a plastic-covered mattress without bedding).

Neither does this case present a constitutional violation of obvious clarity, particularly given the Eleventh Circuit's decision in *Bennett v. Chitwood*, 519 F. App'x 569 (11th Cir. 2013) (unpublished) (per curiam).  In *Bennett*, due to a scabies outbreak prison officials required the plaintiff and other prisoners to remain nude in their cells from 12:00 noon until 10:30 p.m. after they were administered a medicated cream and had their belongings and bedding washed.  *Id.* at 571.  Plaintiff alleged the temperature in his cell hovered in the 50s during that time period.  On the plaintiff's conditions-of-

confinement claim, the court held that "[g]iven the limited duration of [the plaintiff's] exposure to cool temperatures and the modest severity of those temperatures (even accepting [the plaintiff's] estimate that the temperature was in the 50s), the conditions were not so extreme to reach the level of an Eighth Amendment violation." *Id.* at 574 (internal quotation marks omitted) (citing *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (before the Supreme Court developed its current Eighth Amendment analysis, reversing the district court's grant of summary judgment in favor of prison officials where—for 16 days—a prisoner was denied clothing except undershorts, confined to a cell with temperatures as low as 60 degrees, and required to sleep on a plastic-covered mattress without bedding)).

While the *Bennett* decision cannot clearly establish law because it is unpublished, it can demonstrate the unclarity of the law regarding the conduct at issue.[71] The circumstances in the *Bennett* decision correspond closely to the pertinent circumstances at bar, save for the temperature difference, the outside exposure, and the wet clothing, and the duration of the incident. Although the distinctions as to the first three factors compel a finding of a constitutional violation, their close approximation to the *Bennett* decision counsel hesitation in finding Pickens's rights were clearly established in this regard, particularly as to whether there manifested of obvious clarity.

---

[71] While courts cannot rely on unpublished opinions to define clearly established law, an unpublished opinion may have relevance in demonstrating the unclarity of applicable legal principles. 2 SHELDON H. NAHMOD, CIVIL RIGHTS & CIVIL LIBERTIES LITIGATION: THE LAW OF SECTION 1983 § 8:22 (September 2021 ed.) (quoting *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018)).

Therefore, CO McMahan, CO Roggensack, and CO Weller stand entitled to judgment as a matter of law as to the afore-discussed claims, and the court should grant their motion for summary judgment as to those claims. *Celotex Corp.*, 477 U.S. at 322-23.

## F.    First Amendment Retaliation Claim

"First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment." *Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008) (internal quotation marks and citation omitted). *See also Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) ("It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement….It is also established that an inmate may maintain a cause of action against prison administrators who retaliate against him for making such complaints." (citation omitted)); *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989) (per curiam) ("[I]f [a prisoner] is able to establish that his discipline was the result of his having filed a grievance concerning the conditions of his imprisonment, he will have raised a constitutional issue.").

"To state a retaliation claim, the commonly accepted formulation requires that a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech;

and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Douglas*, 535 F.3d at 1321 (internal quotation marks and citation omitted). "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). "The causal connection inquiry asks whether the defendants were subjectively motivated to discipline because [plaintiff] complained of some of the conditions of his confinement." *Smith*, 532 F.3d at 1278.

> "[O]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on [his motion for judgment as a matter of law or prior to trial on] summary judgment.

*Smith*, 532 F.3d at 1278 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999), *abrogated in part on other grounds by Jones v. Bock*, 549 U.S. 199 (2007)); *see also Moton v. Cowart*, 631 F.3d 1337, 1341-1342 (11th Cir. 2011).

### 1.    March 5, 2021, Incident

To recount, while Pickens was handcuffed, Pickens pulled away from CO Neve and attempted to reach CO Andrews.  (Doc. 33-4 (Neve Aff.) at 1; Doc. 33-10 at 1). CO Neve pepper-sprayed Pickens, made Pickens drop to his knees, kicked Pickens in the back, and made Pickens put his face in the dirt.  (Doc. 1 at 6; *see also* Doc. 33-8 at

1).  CO Neve then told Pickens he "better stop" complaining about him because "no one care[d]."  (Doc. 1 at 6).

Pickens falls short of establishing the third element necessary to maintain a retaliation claim for CO Neve's conduct.  That is, Pickens did not establish a causal connection between his protected speech (complaining to the supervisors at Limestone) and CO Neve's actions in applying force to Pickens on March 5, 2021.  CO Neve justifiably used force on that occasion due to Pickens's threat to another correctional officer, and CO Neve's remark does not detract from that finding:

> We acknowledge that [the correctional officer's] contemporaneous statement concerning Plaintiff's prior administrative complaint is probative of a potentially improper motive, but that motive does not negate the propriety of using a limited amount of force to restrain an inmate believed to have spit on an officer. *C.f. O'Bryant v. Finch*, 637 F.3d 1207, 1220 (11th Cir. 2011) ("Stated another way, even if some impermissible reason had entered into [the officers'] decision-making process ..., [the prisoner] would have been disciplined anyway....").

*Burke*, 653 F. App'x at 698 n.15.

Pickens failed to make a *prima facie* showing of an essential element of his retaliation claim against CO Neve concerning the March 5, 2021, Incident.  As such, CO Neve stands entitled to judgment as a matter of law, and the court should grant his motion for summary judgment as to this claim.  *Celotex Corp.*, 477 U.S. at 322-23.

### 2.    March 27, 2021, Incident

On March 27, 2021, CO Neve and CO Lieber escorted Pickens and his cellmate to shower.  (Doc. 1 at 7).  While Pickens showered on March 27, 2021, CO Neve and

CO Lieber stood nearby calling Pickens a "snitch" and a "pussy" because Pickens wrote the wardens and the captains to complain about them. (Doc. 1 at 7). When Pickens responded he would not have to write the wardens and captains if CO Neve and CO Lieber would stop assaulting and pepper spraying him, CO Neve called Pickens a "faggot" and a "snitch." (Doc. 1 at 7). CO Lieber told Pickens he must be a "prison sissy" because he had such a "nice ass." (Doc. 1 at 7). As CO Lieber and CO Neve walked away, CO Neve loudly proclaimed Pickens was a snitch. (Doc. 1 at 7). Pickens's cellmate and another inmate heard all of the foregoing exchange. (Doc. 1 at 7).

Pickens's claims fail as to the second element of a retaliation claim. The Eleventh Circuit has adopted an objective test as to the second element, which maintains "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter [or chill] a person of ordinary firmness from the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1255 (11th Cir. 2005) (quoting *Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 499, 500 (4th Cir. 2005)). Therefore, "something more than the mere retaliatory act is necessary to give rise to an actionable claim" and "government officials should not be liable when the plaintiff is unreasonably weak-willed or suffers only a de minimus inconvenience to [his] exercise of First Amendment rights." *Id.* at 1252 (internal quotation marks and citations omitted).

In this instance, Pickens suffered only a de minimis inconvenience to his exercise of First Amendment rights. "Derogatory, demeaning, profane, threatening or abusive

comments made by an officer to an inmate, no matter how repugnant or unprofessional, do not rise to the level of a constitutional violation." *Lynch v. Bolling*, No. 4:20-cv-00053-RDP-JHE, 2020 WL 6588735, at *7 (N.D. Ala. Oct. 19, 2020), *report and recommendation adopted by* 2020 WL 6585606 (N.D. Ala. Nov. 10, 2020) (finding plaintiff failed to identify an adverse action from the filing of a PREA claim where plaintiff alleged he feared retaliation and had been called a "snitch" (citation omitted)); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008) (holding that inmate's claim of "verbal abuse alone is insufficient to state a constitutional claim"); *Edwards v. Gilbert*, 867 F.2d 1271, 1273 n.1 (11th Cir. 1989) (verbal taunts, despite their distressing nature, fail to show a violation of an inmate's constitutional rights))).

Pickens failed to make a *prima facie* showing of an essential element of his retaliation claims against CO Lieber and CO Neve as to the March 27, 2021, Incident. As such, CO Lieber and CO Neve stand entitled to judgment as a matter of law, and the court should grant their motion for summary judgment as to this claim. *Celotex Corp.*, 477 U.S. at 322-23.

## G.     Eighth Amendment – Failure to Protect

Pickens asserts a failure to protect claim against the Supervisory Defendants, relying on his allegations he informed them, both verbally and in writing, of the substantial threat of serious harm Pickens faced from the Limestone correctional officers named in this lawsuit.

To the extent Pickens seeks to sue the Supervisory Defendants in their capacity

66

as a supervisor, Pickens's claims fail. "'[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'" *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)); *see also Stallworth v. Wilkins*, 802 F. App'x 435, 445 (11th Cir. 2020) (unpublished) (per curiam) ("[S]upervisory officials may not be held vicariously liable under § 1983 for the unconstitutional acts of their subordinates." (citing *Cottone*, 326 F.3d at 1360)).  Rather, a plaintiff must allege the "supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith*, 749 F.3d at 1047-48; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *Hoever v. Belleis*, 703 F. App'x 908, 911 (11th Cir. 2017) (unpublished) (per curiam) (citing *Cottone*, 326 F.3d at 1360).

> "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  Alternatively, the causal connection may be established when a supervisor's custom or policy…result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."

*Keith*, 749 F.3d at 1048 (quoting *Cottone*, 326 F.3d at 1360); *see also Goebert v. Lee Cnty.*, 510 F.3d 1312, 1331 (11th Cir. 2007) (quoting *West v. Tillman*, 496 F.3d 1321, 1328-29

(11th Cir. 2007) (per curiam)).  "'The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'"  *Keith*, 749 F.3d at 1048 (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).  In addition, an officer who responds to a known risk in an objectively reasonable manner does not violate the Eighth Amendment.  *See, e.g.*, *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016) ("Rather, a prison official violates the Eighth Amendment [in the context of a failure to prevent harm] only 'when a substantial risk of serious harm, of which the official is subjectively aware, exists ***and the official does not respond reasonably to the risk***.'" (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (emphasis added)); *Green v. Hooks*, 798 F. App'x 411, 420 (11th Cir. 2020) (unpublished) (same).

Pickens argues the Supervisory Defendants knew the Correctional Officer Defendants would act unlawfully because Pickens complained of the February 15, February 20, March 5, and March 27 incidents.[72]  Despite the knowledge imparted by

---

[72] The Supervisory Defendants do not remember any of the alleged incidents Pickens set forth in his complaint, and they do not remember receiving any inmate request slips or other communications from Pickens expressing he feared for his safety because of the alleged incidents. (Doc. 31-1 (Toney Decl.) at 2 ¶ 4; Doc. 31-2 (Streeter Decl.) at 2 ¶ 4; Doc. 31-3 (Captain Smith Decl.) at 2 ¶ 4; Doc. 31-4 (Warden Pickens Decl.) at 2 ¶ 4; Doc. 31-5 (Coady Decl.) at 2 ¶ 4; Doc. 31-6 (Caldwell Decl.) at 2 ¶ 4; Doc. 31-7 (Whitfield Decl.) at 2 ¶ 4; Doc. 31-8 (Howell Decl.) at 2 ¶ 4; Doc. 31-9 (Beaty Decl.) at 2 ¶ 4; Doc. 31-10 (Sgt. Smith Decl.) at 2 ¶ 4).  Neither could Warden Streeter, Captain Smith, Captain Caldwell, Lt. Whitfield, Lt. Howell, or Sgt. Beaty locate any inmate request slips or other communications from Pickens's fear.  (Doc. 31-2 (Streeter Decl.) at 2 ¶ 4; Doc. 31-3 (Captain Smith Decl.) at 2 ¶ 4; Doc. 31-6 (Caldwell Decl.) at 2 ¶ 4; Doc. 31-7 (Whitfield Decl.) at 2 ¶ 4; Doc. 31-8 (Howell Decl.) at 2 ¶ 4; Doc. 31-9 (Beaty Decl.) at 2 ¶ 4).

Pickens's reporting, the Supervisory Defendants failed to prevent the February 20, March 5, and March 27 incidents, thus rendering the Supervisory Defendants liable for the unlawful actions of their subordinates.[73]

Assuming Pickens stands correct that the Supervisory Defendants maintained subjective knowledge of the February 15, February 20, March 5, and March 27 incidents, knowledge of those incidents do not support an inference any of the Supervisory Officials knew their subordinates would act unlawfully and failed to prevent them from doing so, or that they failed to respond reasonably to any complaints.

## A.   February 20, 2021, Incident

On February 15, 2021, while Pickens was housed in a restrictive housing cell at

---

Pickens avers he "filed complaints on paper to all Supervisory Defendants [himself]." (Doc. 38 at 1).   When Pickens asked Warden Streeter or Captain Pickens whether they received his complaints at "seg board" on Wednesdays, they responded they had not. (Doc. 38 at 1). Pickens re-wrote his complaints and gave them to Dr. Bell, the mental health supervisor, to make copies for Pickens's mental health file. (Doc. 38 at 1).   Dr. Bell then gave copies to the Supervisory Defendants. (Doc. 38 at 1).   Pickens further avers he informed his lawyer about the February 5 and February 20 incidents during a phone call the last week of February. (Doc. 38 at 1-2).   His attorney then spoke to Warden Streeter who transferred him to Captain Smith. (Doc. 38 at 2).   Captain Smith brought Pickens a complaint form. (Doc. 38 at 2).   None of these factual allegations establish Pickens's personal knowledge that any of the Supervisory Defendants received his written complaints.

[73] Pickens failed to establish that any of the Supervisory Defendants maintained customs or policies that resulted in deliberate indifference to Pickens's constitutional rights, or that any of the Supervisory Defendants directed subordinates to act unlawfully.   Furthermore, Pickens did not establish a history of widespread abuse such that any of the Supervisory Defendants would be on notice of the need to correct an alleged constitutional deprivation. *See Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1052 (11th Cir. 2014) (finding one "tragic" incident did not constitute evidence of "widespread and flagrant abuse sufficient to alert [defendant supervisor] to a substantial risk of serious harm").

Limestone, CO Lieber pepper sprayed Pickens through his cell food door after Pickens claimed suicidality. (Doc. 1 at 5). Twenty minutes later, Pickens again kicked his door. (Doc. 1 at 5). When CO Lieber arrived at Pickens's cell, he opened the tray door to Pickens's cell to speak with Pickens. (Doc. 33-2 (Lieber Aff.) at 1-2 ¶¶ 5; Doc. 33-8 at 1). Pickens requested a body chart, asked to speak to a supervisor, and again expressed suicidality to CO Lieber. (Doc. 1 at 5). CO Lieber pepper-sprayed Pickens a second time. (Doc. 1 at 5; Doc. 33-8 at 1). Following CO Lieber's pepper-spraying of Pickens, CO Neve and Sergeant Moore placed Pickens in restraints and escorted Pickens to the medical unit for decontamination. (Doc. 33-2 (Lieber Aff.) at 1-2 ¶ 5; Doc. 33-4 (Neve Declr.) at 1; Doc. 33-8 at 1; *see also* Doc. 1 at 5). While taking Pickens outside, CO Neve grabbed Pickens by the back of the neck and rammed Pickens's head into a wall twice. (Doc. 1 at 5).

Presuming Pickens's timely reporting of the February 15 incident, the Supervisory Defendants knew CO Lieber and CO Neve potentially violated Pickens's constitutional rights. This knowledge does not support an inference the Supervisory Defendants knew that CO McMahan, CO Roggensack, and CO Weller would violate Pickens's rights shortly thereafter.

To recall, after CO McMahan refused to take Pickens to obtain medical attention on February 20, 2021, Pickens started a fire in his cell to attract a supervisor's attention. CO McMahan, CO Roggensack, and CO Weller responded to the fire. Although Pickens informed CO McMahan, CO Roggensack, and CO Weller he had already

extinguished the fire, they sprayed Pickens in the face with the water hose, and CO McMahan chased Pickens around the cell continuing to spray him.  They then left Pickens, still soaking wet, in an outdoor walk cage in weather cold enough for snow to be on the ground for about an hour.

Because the Supervisory Defendants did not have knowledge that CO McMahan, CO Roggensack, and CO Weller would act unlawfully on February 20, 2021, the Supervisory Defendants cannot be held liable for the actions of their subordinates on that date. *See Keith*, 749 F.3d at 1048 (finding the necessary causal connection to find a supervisor liable for the actions of a subordinate where the supervisor "knew that the subordinates would act unlawfully and failed to stop them from doing so").

### B.    March 5, 2021, Incident

#### 1.    CO Andrews

Presuming Pickens's timely reporting of the February 15 incident and February 20 incidents, the Supervisory Defendants knew CO Lieber, CO Neve, CO McMahan, CO Roggensack, and CO Weller potentially violated Pickens's constitutional rights. This knowledge in no way supports an inference the Supervisory Defendants knew that CO Andrews would violate Pickens's rights shortly thereafter on March 5, 2021, when CO Andrews opened Pickens's food trap and pepper sprayed him with no penological justification.

Because the Supervisory Defendants did not have knowledge that CO Andrews would act unlawfully on March 5, 2021, the Supervisory Defendants cannot be held

liable for his actions on that date.  *See Keith*, 749 F.3d at 1048 (finding the necessary causal connection to find a supervisor liable for the actions of a subordinate where the supervisor "knew that the subordinates would act unlawfully and failed to stop them from doing so").

### 2.     CO Neve

The undersigned concluded Pickens's failed to make a *prima facie* showing CO Neve violated his constitutional rights on March 5, 2021, as to the initial takedown when Pickens charged at another corrections officer.   As such, the Supervisory Defendants cannot be held liable for CO Neve's actions on that date.  *Green v. Hooks*, 798 F. App'x 411, 427 (11th Cir. 2020) (unpublished) (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019)) ("'[T]here can be no supervisory liability...if there was no underlying constitutional violation.'").

However, Pickens's allegations CO Neve deployed a chokehold that caused him to black out asserts a viable excessive force claim.   Nevertheless, Pickens's failure-to-protect claim still fails as to CO Neve's use of force in this regard.   Assuming Pickens complained of CO Neve's February 15, 2021, conduct as an abuse of force and expressed fear for his life therewith, the Supervisory Defendants responded reasonably to the complaints given the record evidence.

To recount, the February 15, 2021, conduct at issue involve CO Neve's alleged slamming of Pickens's head into a wall.  If Pickens's complained about this incident, the Supervisory Defendants reasonably responded to the complaint because the

investigation of the incident did not substantiate any such assertions. In particular, a "USE OF FORCE INMATE WRITTEN STATEMENT" notes Pickens refused to provide a statement about the incident. (Doc. 33-8 at 7). And the Incident Report regarding the events chronicle Pickens's refusal to provide a statement about the February 15, 2021, encounter, and it does not portray Pickens's head struck a wall, much less that CO Neve caused such a striking. (Doc. 33-8 at 1).

Therefore, the Supervisory Defendants did not fail to protect Pickens before CO Neve's alleged use of a chokehold on March 5, 2021, because investigation of the complaints stemming from the February 15, 2021, incident did not indicate any ongoing threat vis-a-vis Neve. That is, the Supervisory Defendants responded reasonably to Pickens's alleged complaint about CO Neve because the investigation of the complaint contradicted his account.

## C.     March 27, 2021, Incident

The undersigned concluded Pickens's failed to make a *prima facie* showing of a violation of his constitutional rights on March 27, 2021. As such, the Supervisory Defendants cannot be held liable for the actions of their subordinates on that date. *Green*, 798 F. App'x at 427 (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019)) ("'[T]here can be no supervisory liability...if there was no underlying constitutional violation.'").

Pickens failed to make a *prima facie* case against the Supervisory Defendants. As such, the Supervisory Defendants stand entitled to judgment as a matter of law, and the

73

court should grant their motion for summary judgment as to this claim.  *Celotex Corp.*, 477 U.S. at 322-23.

## VII. RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** the court **GRANT** the Supervisory Defendants' motion for summary judgment, (doc. 31), and **DISMISS** Pickens's claims against them **WITH PREJUDICE**.   The Magistrate Judge **FURTHER RECOMMENDS** the court **GRANT** the Correctional Officer Defendants' motion for summary judgment, (doc. 33): as to all official capacity claims for monetary relief; as to the following individual capacity claims for monetary relief – (1) the Eighth Amendment deliberate indifference to serious mental health needs claim against CO Lieber, (2) the Eighth Amendment deliberate indifference to serious medical needs claim against CO McMahan and CO Roggensack, (3) the Eighth Amendment excessive use of force claim as to CO Neve for the March 5, 2021, incident regarding the takedown when Pickens charged another corrections officer and the March 27, 2021, incident, (4) the Eighth Amendment conditions of confinement claim against CO McMahan, CO Roggensack, and CO Weller, and (5) the First Amendment retaliation claim as to CO Lieber and CO Neve; and **DENY** the Correctional Officer Defendants' motion for summary judgment, (doc. 33), as to the individual capacity claims for monetary relief for the Eighth Amendment excessive use of force claims against (1) CO Lieber for the February 15, 2021, incident, (2) CO Neve for the February 15, 2021, incident, (3) CO McMahan, CO Roggensack, and CO Weller for the February

74

20, 2021, incident, and (4) CO Andrews for the March 5, 2021, incident; and CO Neve

for the March 5, 2021, incident regarding the use of the chokehold.

The recommended remaining claims present as follows:

| Defendant | Claim | Alleged Incident |
|---|---|---|
| CO Lieber | Excessive Force | 02/15/2021: unwarranted pepper-spraying |
| CO Neve | Excessive Force | 02/15/2021: slamming head into wall<br>03/05/2021: chokehold |
| CO McMahan<br>CO Roggensack<br>CO Weller | Excessive Force | 02/20/2021:  spraying with water hose |
| CO Andrews | Excessive Force | 03/05/2021:  unwarranted pepper-spraying |

## VIII.  NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and

recommendation.  Any objections must be filed with the Clerk of Court within **14 days**.

The objecting party must identify every objectionable finding of fact or

recommendation and state the specific basis for every objection.  The objecting party

also must identify every claim in the complaint that the report and recommendation has

not addressed.  Objections should not contain new allegations, present additional

evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate

Judge's report and recommendation waives the right to challenge on appeal those same

conclusions adopted in the District Judge's order.  Without a proper objection,

however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify in whole or in part the Magistrate Judge's findings of fact and recommendations. The District Judge will conduct a hearing if required by law and may exercise discretion to conduct a hearing or otherwise receive additional evidence. Otherwise, the District Judge may consider the record developed before the Magistrate Judge in making an independent determination of the relevant legal issues. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment entered by a District Judge.

**DONE** this 31st day of July, 2023.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

76